**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

Joseph Odish, individual,
Cranbrook Capital Consulting Group, LLC,

Plaintiffs,                                                        CASE NO:
-vs-                                                                   HON. JUDGE:

APPLE, INC., NUANCE COMMUNICATIONS, INC.,
WESLEY BUSH, NORTHROP GRUMMAN CORPORATION,
COGNITIVE CODE CORPORATION, Salvatore
Difazio, Leslie Spring, Mimi Chen, John Chen,
Timothy Cook, Paul Ricci, Howard Friedman,
Robert Rosen, International Business Machines
Corporation, Oracle Corporation, Patrick Miller,
Jeremy Lieberman, Joel Bock, US DENTONS LLP,
jointly and severally.

Defendants.
_____/

## ORIGINAL COMPLAINT

**NOW COME** PLAINTIFFS JOSEPH ODISH, and Cranbrook Capital Consulting Group,
LLC, a Michigan limited liability company, (collectively "PLAINTIFFS") and bring this
action complaining of the Defendants as follows:

## I. PRELIMINARY STATEMENT AND PARTIES TO THE ACTION.

1. This is an action that involves civil conspiracy, common law fraud, unlawful
   misappropriation of intellectual property, securities fraud, civil rico and other
   elements.
2. The fraud and conspiracy are continuous and ongoing and the vast majority of
   the basis of this action is a result of actionable conduct which took place after the
   initiation of a lawsuit where Plaintiffs own attorney, Defendant Robert Rosen,
   conspired against his client and with defendants to destroy Plaintiffs' rights in a
   conspiratorial, fraudulent and deceptive purpose to cover up illicit and unlawful
   conduct by Defendants and their co-conspirators.
3. The majority of facts and claims in this complaint were learned by Plaintiffs within
   the last several months prior to the filing of this action.

1

4. Plaintiff Joseph Odish is an individual and resident of Michigan.
5. Plaintiff Cranbook Capital Consulting Group, LLC, is a Michigan limited liability company.
6. Defendant APPLE, INC. ("Apple") is a California Corporation with principal offices in California.
7. Defendant Wesley Bush is a resident of Virginia and Chief Executive Officer of Northrop Grumman Corporation.
8. Defendant Northrop Grumman Corporation ("Northrop Grumman") is a Delaware Corporation with principal offices in Virginia but conducting business worldwide and in this forum.
9. Defendant Nuance Communications, Inc. ("Nuance") is a Delaware Corporation with principal offices in Massachusetts.
10. Defendant Cognitive Code Corporation is a Delaware Corporation with principal offices in New Jersey.
11. Defendant Salvatore Difazio is a resident of New Jersey.
12. Defendant John Chen is a resident of New Jersey.
13. Defendant Howard Fredman is a resident of California.
14. Defendant Leslie Spring is a resident of California.
15. Defendant Robert Rosen is a resident of California.
16. Defendant Mimi Chen is a resident of California.
17. Defendant Paul Ricci is a resident of Massachusetts and the CEO of Defendant Nuance.
18. Defendant Timothy Cook is a resident of California and the CEO of Defendant Apple.
19. Defendant International Business Machines Corporation ("IBM") is incorporated in the State of New York with principal offices in the state of New York and conducts business worldwide and in this venue.
20. Defendant Oracle Corporation ("Oracle") is incorporate in the State of Delaware with principles offices in Redwood, California.
21. Defendant Joel Bock is a resident of the State of New Jersey and a lawyer who has tried cases in the eastern district of Michigan.
22. Defendant US DENTONS LLP is a global law firm with principal offices throughout United States and related entities and offices all over the world. Defendant Joel Bock is an attorney for US DENTIONS LLP and works out of the firm's New Jersey office.
23. Defendant Patrick Miller is a resident of Alabama.
24. Defendant Jeremy Lieberman is a resident of the State of New York.

## III. JURISDICTION AND VENUE

25. Jurisdiction and Venue are proper under Diversity of Citizenship federal statute, 28 U.S Code § 1332.
26. The amount in controversy greatly exceeds $75,000.
27. Defendant Apple has availed itself of the benefits of transacting business within this State and forum. Defendant Apple is a tech giant specializing in the

manufacture of laptops, cellphones (known as iphones), tablets known as Ipads, and other electronics.

28. Plaintiff Odish has purchased numerous products sold by Defendant Apple within this district, including two iphones and two ipads over the past few years.

29. Defendant Nuance has availed itself of the benefits of transacting business within this State and forum.

30. Defendant Nuance specializes in the manufacture and distribution of a speech recognition software known as DRAGON SPEECH RECOGNITION. This software is sold online to Michigan residents and in stores located throughout this District.

31. Pursuant to its SEC filings, NUANCE is a contractor with the United States Government.

32. Plaintiff Odish purchased DRAGON SPEECH RECOGNITION software in this District.

33. Defendant Northrop Grumman has availed itself and transacted business within this forum. Defendant Wesley Bush as CEO is subject to jurisdiction in this forum.

34. Defendant Cognitive Code has availed itself of the benefits of this forum and has transacted business with this forum, including but not limited to Chrysler, ONstar (owned by General Motors) and Visteon. Chrysler, ONstar and Visteon conduct significant activities in this forum.

35. Venue is proper in this district because the fraudulent scheme was in large part carried out by the use of instrumentalities of commerce and mails to effectuate the fraud and the illegal and unlawful misconduct which remains ongoing.

36. Under co-conspiracy law of venue, it is not necessary that each named defendant have engaged in transactions in Forum district and act of single defendant is therefore deemed to be act of all defendants, establishing venue as to all Defendants in that District; therefore, venue is proper where important steps in the execution and consummation of the fraudulent scheme.

37. Important steps in the execution and consummation of the fraudulent scheme have taken place in this forum.

## GENERAL ALLEGATIONS AND FACTUAL BACKGROUND

38. With the unlawful and illegal assistance by Defendants and co-conspirators, specifically Defendants Northrop Grumman and Defendants Nuance, Cognitive Code Corporation has developed software and intellectual property involving artificial intelligence technology known as SILVIA™ and had filed a patent application in 2008.

39. The closest market competitor to SILVIA™ was another supposed artificial intelligence product which operated more as an "app" or application, known as SIRI. SIRI is an inferior technology, as it is not as valuable, adaptable, or commercially viable as SILVIA™. In essence, SIRI is not true "artificial intelligence."

40. Upon information and belief, the potential revenues and values that could be generated by such a valuable patent/IP/software such as SILVIA™ could exceed

a billion dollars just from significant penetration in just one or two business sectors. In March 2011 Business Plan for Cognitive Code Corp. that Plaintiffs were sent, it stated that SILVIA TECHNOLOGY could create unlimited "apps" or applications in multiple sectors based upon its Artificial Intelligence and generate enormous amounts of money.

41. Plaintiffs would come to learn in recent months the significant difference in the value of Intellectual Property between a "Cross Multiple Purpose Platform" technology/IP/patent such as SILVIA™ [which creates "apps" or applications] and mere "apps" or applications, such as SIRI or EVERNOTE.

42. The vast majority of "apps" or applications are either free, or generate minimal/nomical income. SIRI was a free "app" that Gary Morgenthaler and Morgenthaler Ventures sold to APPLE, the world's largest tech giant, for approximately 250 million dollars.

43. The significant difference between SILVIA technology, as told to Odish by Cognitive Code defendants, that made it superior to SIRI and IBM's WATSON was that the software based upon a pending patent/intellectual property (USPTO patent number #8326813) was that SILIVIA had the potential to "run natively".

44. To "run natively" meant that it did not need a warehouse of servers supporting it, they that IBM's Watson and SIRI did.

45. In early March 2011, Plaintiffs would incur a $175,000 obligation for opportunity to do business with Cognitive Code Corporation and its three founders, Defendants Spring, Chen and Chen.

46. On March 1, 2011, Defendant Chen sent Plaintiffs an email informing him of their attorney and their representation. The company was represented by Joel Bock, a partner specializing in Intellectual Property and patents of the global law firm SNR DENTON.

47. Also on March 1, 2011, Defendant John Chen emailed Plaintiffs the Company's business plan, which specifically stated that the company was represented by law firms SNR DENTON and PERKINS COIE.

48. The business plan further represented that potential value of SILVIA™ platform and discussed its enormous potential in multiple business sectors of defense industry, medical/healthcare, mobile/cellular, gaming, toys, automotive telematics, and Enterprise solutions.

49. On March 1st, 2011, Defendant John Chen emailed Odish a Cognitive Code Business Plan/Prospectus, which stated the following items:

- "*SILVIA a platform for development of conversationally intelligent applications*"
- Understand Human language and respond back
- True and Revolutionary Artificial Intelligence
- Cross Platform technology/Intellectual Property that operates in any device: laptops, smart phones, Blackberry, medical and health, consumer electronics devices, smart toys, etc.
- Easy to train in multiple languages.
- SILVIA technology can be "embedded" in many products across a variety of verticals, addressing a market of 2 billion

- Cell Phones, Automotive Telematics, Video Gaming, Legal, Healthcare, Call Center Automation, Smart Toys.
- Currently Seeking 2 million dollars in investment capital to expand its operations and exploit vertical opportunities.
- Everything is becoming more digital.
- Cognitive Code's mission is to enable smart digital technologies through the practical application of artificial intelligence: Natural Language Interaction, Intelligent Response… Cognitive Code has achieved a breakthrough in human to system interaction…"
- "Personal Assistant or Intelligent Agents". NLP - Natural Language Processing Artificial Intelligence compact enough to fit on a cell phone.
- Language Independent: can be taught in English, Spanish, or French with the same effort, no special programming required.
- Can support dynamic language translation: **talk in one language and it can construct a response in another language**.
- SILVIA can be embedded in any processor, mobile device, computer, server, laptop or other consumer electronic products.
- Go to Market Strategy: engage top 5 leading vendors in each target market directly and build pre-production proofs-of-concept and custom prototypes: Cellular, Video Gaming, Automotive Telematics, Healthcare, Legal, Online Social Marketing, Automotive Fatigue Management, etc.
- Key Competitors: NUANCE - NLP processing to do speech recognition with Target Markets in Automotive Market, Legal, Medical, Casual Market. How We Compare to Nuance: Complementary Solution, **They focus on speech recognition, we focus on meaning and context interpretation**.
- Three Current Employees
- Intellectual Property and Legal Representation From Sonnenschien Nath & Rosenthal LLP (SNR Denton).
- Advisors and Ownership: The Company is actively recruiting members to its Board of Directors to bring strong financial and technical capabilities. Current advisory team includes Belmar Winds, LLC and Legal Consulting From SNR Denton and Perkins Coie LLP.
- 3% percent equity has been issued to two additional stockholders as part of a Friends and Family in a pre-Series A money raise. Schedule of Stockholders available upon request.

50. Cognitive Code Defendants had legal representation at the time but were heavily in debt to their lawyers and refused to allow Odish to speak to them.

51. The conference call on March 1, 2011 went well and on March 6, 2011, the parties executed a Letter of Intent for "Cranbrook" to seek and procure funding of 2.5 million dollars for 20% non-dilutable equity stake in Defendant Cognitive Code Corporation.

52. Immediately subsequent to the execution of the March 6, 2011 LOI, Defendant Chen used the mail service to "overnight" some due diligence documents from New Jersey, where Cognitive Code was headquarted, to Plaintiffs' home in Michigan.

53. The documents were not coherent, nor organized in a professional manner, nor were some important documents (such as Assignment of Patent) even signed. Some documents had been ripped out of a binder.

54. Plaintiffs was also emailed and faxed significant number of documents for the due diligence, both prior and subsequent to execution of March 6, 2011 Letter of Intent.

55. The documents submitted to Plaintiffs showed that Cognitive Code was a true startup in every sense. The Cognitive Code defendants had signed a number of agreements injurious to the company.

56. The most harmful of these agreements was the INTELLITAR SOFTWARE AGREEMENT, which had a venue and forum for any potential litigation to be conducted in Huntsville, Alabama.

57. Prior to meeting Plaintiffs, Cognitive Code Defendants had become an approved vendor and SUBCONTRACTOR for DEFENDANT Northrop Grumman.

58. Defendant Northrop Grumman, led by its CEO Wesley Bush, are a prime contractor for the UNITED STATES GOVERNMENT.

59. At the time Defendant Northrop Grumman

60. Defendant Spring emailed Plaintiffs an email correspondence from Jerry Waugh, a high-ranking executive at Northrop Grumman, the IMI Manager at NG for Virtual Training Systems (VTS) dated February 23, 2011, which stated in part:

*"our group at Northrop Grumman is pleased to be developing products for our customers using Cognitive Code's "SILVIA" technologies… in just over a week we will be demonstrating a new custom interactive military training system. This Northrop Grumman developed will be our first product line to use the SILVIA PLATFORM, and will be shown at the upcoming AUSA (Association of the United States Army) in Ft. Laurderdale. Because of the compelling nature of the product, we expect to begin taking a significant number of orders at, or soon after the show… In addition to our work on this upcoming product, our group at Northrop Grumman is also seeking an expanded R & D license for the SILVIA technology. In working with the SILVIA platform we recognize the broad range of intelligent applications… and will allow us to more rapidly develop those applications using SILVIA on a variety of hardware and software platforms.. Cognitive Code's technology is unique in the marketplace, and is proving to be ideal for our needs in creating conversational applications for training and defense. We have made great progess using the SILVIA PLATFORM and we believe that this first product line is only the beginning of what is possible for Northrop Grumman with the SILVIA technology… Cognitive Code is helpful as we move forward with SILVIA technology, offering free samples, code samples, and rapid response to requested enhancements of the software… given rapid success we are achieving using SILVIA platform, we at IMI GROUP AT NORTHROP GRUMMAN look forward to a long and mutually beneficial relationship with Cognitive Code.*

*Best Wishes,*
*Jerry Waugh*

*Charles J. Waugh*
*IMI Manager*
*Northrop Grumman*"

Jerry Waugh Northrop Grumman Letter February 23, 2011.

Subsequently Spring would introduce Jerry Waugh of Northrop Grumman to Plaintiff Odish via email:

*From:  Leslie Spring [leslie@cognitivecode.com]*
*Sent:  Monday, March 07, 2011 2:44 PM*
*To:      Joseph Odish; Waugh, Charles J (IS)*
*Cc:      john@cognitivecode.com; mimi@cognitivecode.com*
*Subject:        Introductions*

*Joseph and Jerry,*

*Allow me to introduce you fine gentlemen to one another.*
*Joseph Odish and his group will be investing in Cognitive Code, once the standard due-diligence phase is complete.  Joseph is one of the "good guys", and we look forward to having him as our investment partner.*

*Jerry Waugh is the IMI Manager at Northrop Grumman, and is Cognitive Code's primary contact within the organization.  Jerry has also been a supportive champion of the SILVIA technology within Northrop Grumman, and has been a big*
*part of why we enjoy working with them so much.*

*Joseph, to help you with your due-diligence, Jerry will be expecting your call, and is ready to talk with you about our relationship with his company.*

*Here is Jerry's phone contact info: 256-612-3402*

*And Jerry, thank you for your time in doing this for us.*

*All the best,*
*Leslie*

*Leslie Spring*
*Founder and CTO*
*Cognitive Code Corporation*
*818.321.3729*

_____

61. **Chrysler and Visteon Confidentiality Agreements with Cognitive Code Corporation.** Plaintiffs was given a CONFIDENTIALITY AGREEMENT between

Cognitive Code and Chrysler signed in December 2010 by Defendant John Chen and Ralph Smith, Chief Patent Counsel for Chrysler. As well as an agreement with Visteon, a significant supplier in automotive industry.

62. Defendant Spring and Plaintiffs become close friends the first few weeks of March 2011 but Plaintiffs after reading the Intellitar contract, the worst and most one-sided contract he had ever read, called Spring and stated he wanted to give him a release from the Letter of Intent and wish him the best of luck. Spring stated to Plaintiffs, *"joseph, I knew you would say that… I knew when you read that awful contract you would want to jump ship…".*

63. On March 16, 2011 Defendant Spring emails Plaintiffs asking him to be a partner in the company. On March 18, 2011, the parties executed an addendum to the agreement that made Plaintiffs a shareholder and Board Member of the tech startup specializing in artificial intelligence. The Contractual Addendum was and is lawful under delaware law, pursuant to statutory code § 152 regarding lawful consideration, and federal law as well. The agreements signed by Plaintiffs, both individually and on behalf of his LLC with Cognitive Code were lawful under any applicable delaware, state and federal laws.

64. **The Dual Signature Rights of Plaintiff Odish are contractual rights tied Plaintiffs' stock**. Plaintiffs contractual rights, which are tied to his non-dilutable stock rights, are relevant to the Defendants actions and this action brought on behalf of United States Government. In order to the protect the company from anymore bad contracts being signed by Defendant John Chen, Odish requested the dual signature requirement.

65. **Northrop Grumman CEO WESLEY BUSH gets presentation on SILVIA artificial intelligence Cross Platform software capability**. On March 30, 2011, Defendant Spring emails Plaintiffs that the 'NORTHROP GRUMMAN PRESENTATION TO THE CEO TOMORROW".

66.  Spring informs Plaintiffs that NG wants a long-term licensing agreement. Plaintiffs was told this would be a "multi-million" dollar licensing contract.

67. The Morgenthalers are and were close personal friends of the Cognitive Code founders. So much so that Gaye Melissa Morgenthaler and David Jones are the godparents of Spring and Mimi Chen's children.

68. In emails sent to Odish, the Morgenthalers are constantly referred to as "the advisors".

69. **April 1, 2011 First Morgenthaler Email and use of term "advisors."**  First Email regarding Cognitive Code's "advisors" - the Morgenthalers, specifically Gary Morgenthaler, the lead partner of Morgenthaler Ventures.

70. On April 1, 2011, Defendant Mimi Chen forwards to Plaintiffs an email written by Gary Morgenthaler.  The April 1, 2011 Morgenthaler email from Mimi Chen specifically states as follows:

*[Fwd: RE: Gary & Todd -- any advice for Mimi?]*
*1 message*

*Joseph Odish <josephodish@gmail.com>*

*Mimi Chen <Mimi@cognitivecode.com> Fri, Apr 1, 2011 at 2:23 PM Reply-To: Mimi@cognitivecode.com*
*To: Joseph Odish <josephodish@gmail.com>, John Bourbeau <johnbourbeau@hotmail.com>*
*Cc: leslie@cognitivecode.com, john@cognitivecode.com, Jason Green <welt_reisender@hotmail.com>*

*These are from our advisors, Lissa and Dave Jones.  They are both serial entrepreneurs; Lissa was my roommate in college, Dave was a bizdev guy for Apple.  Her family is behind Morgenthaler Ventures.  Papa M gave the kids a family rule not to invest in ventures by friends.  But they give us advice freely. M*

*From: Gary J. Morgenthaler [garym@morgenthaler.com] Sent: Friday, April 01, 2011 12:24 PM*
*To: Lissa Morgenthaler-Jones; Mimi@cognitivecode.com; dave@livefuels.com; Todd Morgenthaler*
*Cc: leslie@cognitivecode.com*
*Subject: RE:  Gary & Todd -- any advice for Mimi? Hi Liss and Mimi,*
*I know of the IBM Watson team only indirectly, as I have not met them. Nuance cut a deal with IBM to license the "Watson" technology, and they are busily productizing it.  Regarding dialog with the Watson team, reverse engineering is always a risk.  However, Watson was designed for a very specific goal of a statistical-based question answering system.  Beyond a basic ontology, very little semantics is involved.  Therefore, their architecture may not map well to what Leslie is doing with SILVIA.*

*In discussions like this, it's always best to establish the objective of the dialog beforehand.  Then, you can decide how much to disclose.  In my experience, IBM is very unlikely to remarket SILVIA.*
*It's equally unlikely that they will be effective in marketing AI avatars in the market.  So, you have both little to gain and little to fear.*

*Good luck! Gary*
*-----Original Message-----*
*From: Lissa Morgenthaler-Jones [mailto:lissa@livefuels.com] Sent: Friday, April 01, 2011 9:25 AM*
*To: Mimi@cognitivecode.com; dave@livefuels.com; Gary J. Morgenthaler; Todd Morgenthaler'*
*Subject: RE: Gary & Todd -- any advice for Mimi?*

*IBM Watson's team likes SILVIA.*

*Question is, what do you think of IBM Watson.........?*

71. On April 1, 2011, Plaintiffs was sent an horrific agreement signed by Defendant John Chen on behalf of the Company, the Mitch Leiser Agreement.

72. In early April 2011, Plaintiffs is informed that Chrysler and potentially GM want to integrate SILVIA™ in test and trial applications in their smart cars.

73. **ONSTAR (GM) trial demo agreement from April 2011.**  In April of 2011, Plaintiffs is sent the ONSTAR trial agreement which he review, revises, and adds the dual signature as he and Defendant Spring decide whether they can pursue the opportunity in light of Spring being the "only" engineer and the company's limited resources.

74. Plaintiffs's version of the ONSTAR TRIAL DEMO AGREEMENT from April 2011.

75. ONSTAR is a division owned and controlled by General Motors.

76. This ONSTAR TRIAL DEMO agreement submitted to Plaintiffs in April 2011 is the last and only Agreement Plaintiffs was ever provided to this date, irrespective of his Dual Signature rights, rights as Board Member and Shareholder of the tech startup.

77. At the time of the filing of this action, Plaintiffs still has not received his stock certificates for his shares, a willful violation of Title 15 and federal securities laws.

78. Plaintiffs Odish provided honest services and was retaliated against because he knew of and did not want to be part of any fraudulent or criminal activity or misconduct such as misappropriation of funds, embezzlement. Despite simply providing benefits, honest services and working over 3000 hours as a shareholder and Board Member for the startup Cognitive Code Corporation during 2011 and into 2012,

79. On April 4th, 2011, Spring authorized Plaintiffs to speak to their IP attorney Joel Bock of SNR DENTON. On three occasions subsequent in April and May of 2011, Plaintiffs felt overwhelmed by all the work and offered Defendant Spring and other founders the willingness to give back the non-dilutable ten points that had been granted to him. Cognitive Code defendants refused and asked Plaintiffs to keep the points and continue the provision of benefits and honest services.

80. In the hiring of ALABAMA COUNSEL, Patrick Miller, Plaintiffs sends Miller an email and states that Miller can hold Plaintiffs personally liable for any and all legal fees that accrue from the ALABAMA-INTELLITAR-MEI DEFENSE TECHNOLOGIES, INC proceedings. Defendant Mimi Chen sends Plaintiffs an email thanking him for this.

81. Plaintiffs on or about April 7, 2011 had also sent Joel Bock an email requesting a timeline and amount of legal fees owed and paid and Plaintiffs promised Bock that they would be paid, making himself personally liable.

82. **MAY 17, 2011 PLAINTIFFS LEARN OF COMMISSION OF FRAUD BY DEFENDANT JOHN CHEN AGAINST PLAINTIFFS – JOHN CHEN IS ASKED TO RESIGN.** On May 17, 2011, Plaintiffs learns that Defendant John Chen had committed fraudulent acts against Plaintiffs and Defendant Spring asked for Chen's resignation from the company. Plaintiffs asked for Spring to send him a copy of the Resignation Letter to make sure it comported with the truth and

corporate formalities. Spring refused. Arguments ensured into June 2011, continuing to only days before Plaintiffs's son was born on June 23, 2011.

83. In early June 2011, Defendant Spring seeks advice and counsel from his close friend and godparent of his children, Gary Morgenthaler of Morgenthaler Ventures. Plaintiffs is told that Spring gave Gary Morgenthaler the agreements that had been signed and Gary Morgenthaler advised Spring to try and get out of these agreements, that the non-dilution and other contractual rights Plaintiffs possessed would be issues if the company were ever to be acquired or go public.

84. Spring sends emails acknowledging the vesting of stock rights of Plaintiffs on or about June 10, 2011.

85. On July 6, 2011, Spring sends Odish an email stating, *"looks like we will have to adjust our numbers upward for SILVIA FOR UNITY… Looks like UNITY just passed the 500,000 user mark and now they have a player install of 60 mm users. So that effectively doubles our original revenue estimates for SILVIA FOR UNITY that were based on 250k... In related news, the Army and Air Force have certified the Unity Platform and Web Player as a secure content delivery system… I'll have to talk to the NG folks about that one, and see how much their work is tied into that certification. ;) "*.

### OCTOBER 2011 - APPLE'S NEW IPHONE WITH MORGENTHALER-BACKED SIRI - HAILED AS "ARTIFICIAL INTELLIGENCE" AND DIGITAL "VIRTUAL ASSISTANT".

86. APPLE debuts new iphone with SIRI™, a feature that is supposedly a "virtual assistant" and heavily hyped by Gary Morgenthaler of Morgenthaler Ventures in articles and interviews. SIRI was sold by Gary Morgenthaler and Morgenthaler Ventures to Apple in 2010 for an approximately 250 million dollars.

87. **SIRI is hailed as "artificial intelligence" - BUT IT'S BASICALLY A BUST and a "DATA HOG".**  Gary Morgenthaler of Morgenthaler Ventures gives an enormous amount public support and a number of interviews stating that SIRI is true "artificial intelligence" and will change the way people live and work and is the next generation of voice generation investments, etc. But upon information and belief these statements and predictions turned out to be false as SIRI was merely an "app" that APPLE had problems with because SIRI was deemed a "data hog" and it could not run natively on devices.

    a. SIRI was essentially all commercial hype and one needs look no further as to its commercial and business failure that Morgenthaler-backed NUANCE entity whose own website now mocks SIRI while touting the fraudulently and illegally procured and repackaged "NINA", as a true digital virtual AI assistant.

88. On October 24, 2011, Defendant Spring informs Plaintiffs that he has handed the sale of company over to their "advisor" Gary Morgenthaler. Plaintiffs mildly objected and stated in an email that this was a definitive conflict of interest on two fronts: 1) Odish and Spring had exchanged and discussed over a hundred emails and phone calls specifically stating that SIRI was by far the closest competitor (BACKED BY MORGENTHALER VENTURES and NOW THE TECH WORLD'S NEW "APPLE" DARLING THAT BY GARY MORGENTHALER'S OWN PUBLIC INTERVIEWS WOULD BE REVOLUTIONIARY) and 2) NUANCE,

was specifically listed as a Competitor in the Cognitive Code Business Plan that Plaintiffs had been submitted by Defendant John Chen on March 1, 2011. Defendant Spring wrote an email to Plaintiff Odish to allay his concerns that stated in essence as follows:

*"…Guys, I have told you many times that Gary Morgenthaler of Morgenthaler Ventures is a close friend and I trust him. I am always careful about the information I share with people…Gary is on the board of Nuance and is one of the most ethical men that I know…"*

89. **A "PARTNERSHIP" RELATIONSHIP BETWEEN THE MORGENTHALER-BACKED ENTITY NUANCE EXISTS WITH THE TECH GIANT APPLE.** The Relationship Between Morgenthaler Ventures-Defendants and APPLE is much closer and profound than a mere Venture Capital Firm that has a significant financial interest in a tech behemoth and simply monitors its stock on a daily basis, there exists in a very real sense a true "partnership" between the two entities. Morgenthaler executives recently stated exactly that: "that they are in partnership with Apple." This in and of itself is not illegal or improper but it does become so when Morgenthalers illegally misappropriate - through the exploitation of material, non-public information - and steal a multi-billion dollar patent and IP affording it potential monopoly power in area of digital AI voice transcription with learning capabilities. And of course this theft was blessed and made possible with the knowing conspiratorial acquiescence by their close family friends, the Cognitive Code Co-Conspirators.

90. Relationship Synergy, illicit "tying" arrangements through the use of information and medical technology with the end result of procuring profits from the sale of the products and services related to the lifeline of Apple's cellular products and tablets, especially in the healthcare industry where they can now exploit this artificial intelligence patent in the enormously profitable multiple sectors.

91. As stated herein, the Morgenthalers own substantial stock in APPLE, who was at war with HTC, both of which are publicly traded companies making the misappropriation theory.

92. On October 24, 2011, the United States Patent and Trade Office sends a Notice of Allowance to Defendant Spring. Plaintiffs relied on the fact that Gary Morgenthaler of Morgenthaler Ventures would act in an honest, lawful and appropriate manner in brokering the sale of the tech startup to either HTC or COMCAST. For obvious reasons that would become clear to Plaintiffs Odish, a substantial number of them which Plaintiffs Odish only learned within the 60-90 days prior to the filing of this amended action.

93. In early November 2011, Spring informs Plaintiffs that HTC and COMCAST want to buy cognitive code outright or acquire at the bare minimum a controlling 51% equity stake in the company.

94. On November 9, 2011, Mimi Chen emailed Plaintiffs regarding the Morgenthalers and potential sale of company to tech giant, HTC and stated the following:

*meemersc@netzero.net on behalf of Mimi Chen [mimi@cognitivecode.com]*

*Wednesday ,November 09, 2011 6:07 PM*
*josephodish@gmail .com*
*mimi@cognitivecode.com;*   *jbourbeau@hestia.com Re: mimi, I've told you*
*this before but...*

*Thanks Joseph_,*
*Very nice to hear from you and no worries, I'm the first one to watch how*
*hard Leslie has been working . And yes, it's true, the cash flow problem has*
*been a little tough to deal with, but as Leslie knows, I'm the master at*
*figuring out cash flow.   I've been dealing with this for more than I care to*
*remember.   I will say the credit card companies have become tougher and*
*nastier as of late_, but unbelievable as it may sound, I still have two usable*
*credit cards left!   (isn't that how entrepreneurs fund their companies!?*
*grin) We still have a little left in the retirement account, but not much .*
*Luckily_, I still have my pension! (so if all else fails...)*

*http://techcrunch.com/2811/11/89/gary-morgenthaler-siri-will-eat-google/*
*Meanwhile, here's an article featuring Gary M.   Google obviously needs to*
*respond to SIRI and our job now is getting Eric Schmidt to realize he needs*
*SILVIA.   Melissa M tells me that Eric is in Asia helping HTC on their*
*lawsuit with Apple.   sounds like Google just purchased Motorola Mobility*
*just to help HTC out.   Eric and Wendy live only a half a mile from Liss so*
*I think we'll have to wait til he gets home.*

*From what I can glean, this whole lawsuit against HTC is just venom*
*spewed from Steve Jobs (who from what all of my friends from Silicon*
*Valley tell me, was a really unpleasant person*
*- he's done stuff that would make anyone reel as to the horrible way he*
*treated people).*

*The jury is out as to what HTC wants to do with SILVIA.   I may have made*
*the first contact and they are definitely interested, but don't know what*
*extent.   we'll keep you posted!*

*And yes, thanks for the chuckle on those emails.  I knew eventually we·d all*
*get our misunderstandings straightened out. And hopefully, we'll all get a*
*nice exit on this to really have fun with .*

*Peace_,*
*Mimi :0*
*Leslie and I thought Steve Prast rocks! Great guy. Thanks for the*
*connection.*

95. On the same exact date of November 9, 2011, an article is published which
incorporates an interview by Gary Morgenthaler wherein he states that "SIRI is
going to eat GOOGLE's lunch".

96. But Gary Morgenthaler invested in a company called Lending Club, which also has GOOGLE as investor.

97. Upon information and belief, Defendants Apple, Morgenthaler Ventures and Google, share some of the law firms in the Silicon Valley area.

98. COMCAST AND HTC WANT TO BUY COGNITIVE CODE, LARGELY BECAUSE OF THE PENDING PATENT. In Early November 2011 Defendants Inform the Plaintiffs that both Comcast and HTC have contacted them about a Buyout or at least acquiring a majority equity stake in Cognitive Code Corporation. The valuation of the company skyrocketed in large part because its patent was only months away from being formally issued and its IP was far superior to SIRI.  HTC was at this time a 32 billion dollar company and the world's 3rd largest cell phone manufacturer but it has gotten beat up by Apple for having a weak patent portfolio. It desperately needed to make acquisitions to stay viable. They (the HTC executives) admitted to Spring who admitted to Plaintiffs that the pending patent and SILVIA™ technology was superior to APPLE's technology and more importantly, in light of the raging patent wars at that time between HTC and APPLE (which eventually on December 19, 2011 led the Federal Trade Commission to ban HTC cell phones through April 2012), the HTC executives specifically stated that they needed the patent and intellectual property to fight APPLE in court all over the world.

99. During December of 2011, Plaintiffs does extensive research into the patents owned by APPLE related to SIRI and artificial intelligence. Plaintiffs learns that Apple may be infringing upon our (Cognitive Code's) patent. As stated previously, it was in late October 2011, the US Patent Office issues a Notice of Allowance on the pending patent of Cognitive Code, the latest official hurdle before the United States Patent and Trade Office formally grants official issuance of the patent. In this case, the US patent office would officially issue the artificial intelligence patent.

100.      HTC paid 300 million dollars for a 51% stake in BEATS AUDIO in August 2011. Audio is not HTC's core business. HTC's core business is cellular - the strongest area for Cognitive Code's patent and intellectual property.

101.      Upon information and belief, and in an act of fraud, some of these companies have already entered into commercial licensing agreements with Cognitive Code in violation of the DUAL SIGNATURE contractual rights because the licensing agreements are not executed or approved by Plaintiffs. In the first week of November 2011, Defendant Spring informed Plaintiffs that two multi-billion conglomerates, COMCAST and HTC, wanted to have serious discussions about a possible buyout of the company.

102.      The day before Thanksgiving in November of 2011, Defendant Spring called Plaintiffs and informed him that Northrop Grumman, realizing that Cognitive Code was an acquisition target, wanted a long-term licensing agreement. Spring told Plaintiffs that licensing agreement with Northrop Grumman would be 5 million dollars for ten years and Northrop Grumman would pay them an "earnest money deposit" of several hundred thousand dollars in January 2012.

103.    Obviously, Plaintiffs knew Spring had once again been making fraudulent misrepresentations regarding these numbers. Only a month before in October 2011, Spring told Plaintiffs the Northrop Grumman licensing agreement was "a long way off, ten months off".

104.    In fact, only five days later Defendant Spring would call Bourbeau and inform him that the licensing agreement with Northrop Grumman was actually a ten (10) million dollar agreement for a few years with 6 million dollars to be paid by Northrop Grumman to Cognitive Code in January 2012. Spring would later mention these same numbers to Plaintiffs and inform him that the company was getting 6 million dollars in January 2012.

105.    These inconsistencies were just additional confirmations that Individual Defendants were willfully misrepresenting the truth and withholding material information.

106.    Defendants Inform the Plaintiffs that both Comcast and HTC have contacted them about a Buyout or at least acquiring a majority equity stake in Cognitive Code Corporation. The valuation of the company skyrocketed in large part because its patent was only months away from being formally issued and its IP was far superior to SIRI.  HTC was at this time a 32 billion dollar company and the world's 3rd largest cell phone manufacturer but it has gotten beat up by Apple for having a weak patent portfolio. It desperately needed to make acquisitions to stay viable. They (the HTC executives) admitted to Spring who admitted to Plaintiffs that the pending patent and SILVIA™ technology was superior to APPLE's technology and more importantly, in light of the raging patent wars at that time between HTC and APPLE (which eventually on December 19, 2011 led the Federal Trade Commission to ban HTC cell phones through April 2012), the HTC executives specifically stated that they needed the patent and intellectual property to fight APPLE in court all over the world.

107.    On or about late November 2011, after the parties had learned that Comcast and HTC wanted to buy the company or at least acquire a 51% majority stake (what Defendant Spring termed a strategic partnership), Plaintiffs and Spring had discussions about the Plaintiffs' right to exercise the Option to buy the additional 75,000 shares as referenced in the LOI and extended in the Option Agreement. See Index of Exhibits., April 17 Option Agreement.

108.    During these conversations, Plaintiffs politely asked Spring if he would be upset if Plaintiffs exercised their Option rights to acquire the additional non-dilutable 75,000 shares for $937,000 dollars now that company was worth possibly 400 or 500 million. Spring told Plaintiffs he would not be upset and specifically stated that the Option Rights they possessed in late 2011 were still valid because the patent had not yet been formally issued.

109.    Plaintiffs informed Spring that Bourbeau and he were considering perhaps Assigning their Option Rights and upcharging the Assignee so that could make perhaps a few million dollars from the assignment of the Option Rights. Spring acknowledged that Plaintiffs and Bourbeau certainly had the right of assignability for these Option rights but made it clear he would be very upset if they assigned their option rights for a profit and that they would have no future with the company if they did that. Plaintiffs knew their Option rights under Cranbrook were

valid and relied on Spring's statement expressly confirming the fact. It also gave them the absolute right of assignability to another corporation or entity within Plaintiffs sole and absolute discretion.

110.    The months of November and December 2011 saw an improvement in the relationship between the parties.  During these months, the parties exchanged numerous emails discussing valuation of the company for numbers such as 350 million dollars, based largely upon a comparative analysis of the sale of SIRI, which sold for, upon information and belief, 250 million dollars.

111.    After the November realizations that HTC and COMCAST wanted to buy the company and seek licensing agreements, Spring admits to Plaintiffs that he was right about Gary Morgenthaler and a potential conflict as Gary Morgenthaler admitted to Defendant Spring he "had a conflict" and now the sale of the company was being handled by Gary Morgenthaler's brother, TODD MORGENTHALER. Plaintiffs originally thought Spring had said "Bob" but much later would go online and from website wikipedia see that it was "Todd".

112.    On December 6, 2011, Plaintiffs emailed Mimi Chen and offered some advice. Plaintiffs stated the following the email where he specifically referred to the Morgenthalers as their "Advisors", a term repeated throughout.

*From: Joseph Odish [josephodish@gmail.com]*
*Sent: Tuesday, December 06, 2011 4:07 PM*
*To: Mimi@cognitivecode.com*
*Subject: Re: @BreakingNews, comcast doing deal with Verizon (sorry, for all these emails)*
*You are welcome. It sounds like you have quality advisors who are family friends, which is great. My only suggestion would be to use a top notch attorney in conjunction with your friends morganthalers. Whether its joel bock or maybe someone else in LA. I'd ask the morganthalers.*
*You are swimming with sharks re Comcast, HTC, NG. I despise attorneys (yeah I know) but they are a necessary evil. Especially now.*
*Now speaking of increasing valuation: leslie wants me and JB to set up web demonstrations and/or meetings with these fortune 500 tier ones. I just got off the phone with my friend at Magna. Number 2 tier one in the world. They have more money than chrysler. They've been interested in a demonstration (and eventual licensing agmt) for months, actually since the summer. I will email leslie later and cc Michael at Magna for dates, but one question: can we tell him about comcast and htc? Have we signed any confidentiality agmts with either comcast or htc?*
*I doubt we have but wanted to make sure. I'd like to use these names as leverage for a licensing agmt with magna but dont want to run risk of breaching any confidentiality agreement we may have in place. thanks!*
*Regards,*

*Joseph*

113.    Then on December 12 2011 Mimi Chen thanks Plaintiffs Odish "**for getting the company up and rolling**", via email.

114.    Previously on December 7, 2011, Mimi Chen and Odish had exchanged emails about the situation:
*Re: some tax advice for you and the kids, 2012 is a very important
2 messages*

*Mimi Chen <Mimi@cognitivecode.com> Wed, Dec 7, 2011 at 3:01 PM Reply-To: Mimi@cognitivecode.com
To: Joseph Odish <josephodish@gmail.com> Cc: John Bourbeau <jbourbeau@hestia.com>If Comcast decides to make a bid, it would be interesting to see if HTC would make it a bidding war.  Fun thoughts indeed! Mimi*

*From: Joseph Odish <josephodish@gmail.com> To: Mimi@cognitivecode.com
Subject: Re: some tax advice for you and the kids, 2012 is a very important year tax wise + intellitar was blessing in disguise
Date: Wed, 7 Dec 2011 01:56:24 -0500*

*It's incredibly important stuff. Tax considerations drive 80% of the structure of deals and their acquisition. As leslie told me tonight SIRI sold for 250 mm, which is ridiculous because it was a FREE APP, with no potential for ever making money. Given my research a fair valuation of the company RIGHT NOW IS ABOUT 300 MM, not a penny less. Likely more, but that's the baseline from what I've seen. If we get lucky next month or so,the bottom line number will 300 mm. If you disregard tax consequences, you are looking at giving away anywhere from 40-70 million dollars. You will a
lot of good in the world that uncle sam. Now...*

*In a few months we will have Magna, Sony, Comcast under license as well as NG and Chrysler and Unity will be launched for the 500,000 game developers. That will easily add 100-200 in valuation. Valuation revenue multiples are less important in such special tech companies by the acquiring company is buying a massive expectancy interest. all that said, leslie did absolutely agree that if an offer came in for
250 or 300 mm tomorrow, we jump all over it. It would be crazy not to. And someting tells me comcast will make a significant offer very soon. Just a hunch after reading their acquisitions. Extremely aggressive company. Joseph*

115.    December 12, 2011 email from Spring to Odish discussing the 6 mm dollars [of the ten million dollars, which is likely Fifty Million] starting in January 2012. Spring also gives extensive detail about SILVIA™s platform over SIRI, and specifically mentions at the end of the email that "Beta SILVIA FOR UNITY" RUNTIME already being deployed in SILVIA products in use by the US Army".

See below in full [NOTE: the bold and underlined text are Plaintiffs Odish's comments to his attorney in Spring of 2012]:

*From:  Leslie Spring [mailto: leslie @cognitivecode.com]*
*Sent:  Monday, December 12, 2011 6:04 PM*
*To: josephodish @gmail.com*
*Subject:       Bullet point notes*
*"Joseph,*
*Here is are the bullet points from a current doc that I use for a "1 minute snapshot" of the business.*

*SILVIA is a platform for developing conversationally intelligent applications.*

*You can talk to the computer/mobile device/etc., it talks back, and does practical things for you.*
*Launch of SIRI by Apple as part of iOS validates the voice control market for consumer products, increasing market demand for SILVIA. SIRI is NOT a portable developer's platform, and requires massive server infrastructure. Because of this, Apple is having serious scaling problems as more users come online.*

*SIRI is based on DARPA/Stanford research. Apple/SIRI just filed for patents in Dec. 2010.*
*In contrast, SILVIA is: a practical software developers' platform, is scalable, runs natively on desktops/servers/mobile/game consoles, and SILVIA is truly proprietary technology, developed solely by Cognitive Code, with patents already approved, having been initially filed in 2007.*
*Cognitive Code is self funded, with 2012 projected revenues of over $6M based on currently booked and closing business.*
*Current customers include Northrop Grumman and one of the "Big 3"automotive manufacturers.*
*SILVIA has been adopted as the standard for ALL Northrop Grumman training and simulation applications.*
*SILVIA-based applications products have already been deployed to the US Army.*
*Based on customer demand, Northrop Grumman is launching a new "Artificial Intelligence" division, dedicated to SILVIA-based applications.  We are negotiating a new licensing deal with NG for this new business unit.*
*SILVIA-enabled "Big 3" concept vehicle already in production, SILVIA integration to begin in Q1, 2012.*
*Additional markets for 2012 include mobile, gaming, and cable/home entertainment.*
*SILVIA for Unity - official launch early Q2, 2012, targeting over 500,000 **[NOW OVER 1,000,000]** registered gaming developers, ongoing revenue to include back-end royalty structure.*

*Beta "SILVIA for Unity" runtime already deployed in SILVIA products in use by US Army.*
*Hope some of these help frame the one-pager for you.*
*Leslie ".*

116.      As Plaintiffs continued to work on the one minute snapshot for MAGNA, that Plaintiffs had approached through a friend and they wanted four software SILVIA™ licensing applications. Plaintiffs sent Spring another email on December 16, 2011 asking him to review the memorandum he was drafting to Magna's counsel. Spring's response on December 16, 2011 is restated herein:

*From:  Leslie Spring [mailto: leslie@cognitivecode.com]*
*Sent:  Friday, December 16, 2011 4:22 PM*
*To: josephodish@gmail.com*
*Subject:      Re: Cognitive Code and Magna (draft email for leslie's review (to magna's in house Counsel)*

*"Hey Joseph,*
*Three Points:*

> *1)  A little less detail on the NG relationship would be good. The NEW NG business unit and the new contract, I feel comfortable sharing verbally, under a CA, but not in writing (email), not yet). I think it's safe to mention we're in the process of closing a broader licensing, and that should be enough until I talk to them via voice.*

> *2)  For setting the right tone, I would take out Denso as the alternative.*

> *3)  These days I'm CEO, not CTO, which I think is helpful for them to know they are talking to a decision maker.*

*Leslie".* Spring December 16, 2011 email to Plaintiffs Odish.

117.      Plaintiffs are told that Spring is meeting with senior HTC executives on December 19, 2011. Plaintiffs sends Spring an email wishing him good luck. On December 19, 2011, HTC executives from Taiwan fly in to meet with Spring and after the meeting an excited Spring calls Plaintiffs and tells him *"they were drooling, joseph… they admitted they needed this in their portfolio…".*
118.      December 19, 2011 email from MIMI CHEN saying "meeting with HTC" went great. December 19, 2011 Spring calls Plaintiffs and said his presentation to HTC EXECUTIVES went terrific and "they were drooling, joseph", "they had nothing like this in their portfolio".
119.      On that same day of December 19, 2011 that same day FTC rules in favor of Apple against HTC in their patent infringement suit. NY TIMES article talks about ruling and how HTC has a weak patent portfolio.

120.     During this month, Plaintiffs is researching patents and emails Spring on December 17, 2011 stating that some of Apple's potential SIRI patents might infringe upon "our patent" as Cognitive Code's patent was filed in 2008, and predicated upon Artificial Intelligence while some of Apple's patents were filed later and related not truly to Artificial Intelligence but rather **"Contextual Voice Commands"**.

121.     Not coincidentally, on this very same date of December 19, 2011, as HTC and APPLE had been dueling over patent infringement in US court, the Federal Trade Commission rules in favor of Apple that HTC has infringed on certain Patents owned or licensed by Apple and imposes a ban on HTC [a tiawanese company] from importing their cellphones into United States until April of 2012. Sometime during 2012, the feud is quietly settled and APPLE and HTC quietly enter into a licensing agreement. Upon information and belief, and through Plaintiffs own personal information from this matter this licensing deal was likely "brokered" by Gary Morgenthaler and Morgenthaler Ventures in an egregious and unlawful act of Insider Trading [from realization that Cognitive Code's technology was superior to SIRI and about to be acquired by HTC] as well as serious anticompetitive and likely antitrust violations.

122.     ON DECEMBER 19, 2011, the same day that Defendant Spring was meeting with senior HTC executives over SILVIA's revolutionary capabilities, the FEDERAL TRADE COMMISSION in an action brought by APPLE against HTC in their raging patent wars ruled in favor of APPLE and issued a ban on HTC from importing their cell phones into the United States that would last until April 2012.

123.     After and upon strong information and belief, the Defendants, led by Gary Morgenthaler, likely - upon information and belief - brokered the confidential licensing settlement agreement between the two companies that almost certainly involves and is a result of the unlawful activities described in this action. And now both are customers of NUANCE, a Morgenthaler-backed entity.

124.     **BY 2011, NORTHROP GRUMMAN DEDICATES AN ENTIRE BUSINESS UNIT TO COGNITIVE CODE'S SILVIA™ IP, CREATING A REPACKAGED ARTIFICIAL INTELLIFENCE ASSISTANT OF THEIR OWN KNOWN AS "SAdie™"**.

125.     Northrop Grumman made a significant commitment to the state of the art Intellectual property of Cognitive Code's software SILVIA™. After the October 2011 emails relating to Gary Morgenthaler handling sale of company, when HTC and COMCAST expressed acquisition.

126.     Subsequently in late 2011, when Northrop Grumman realizes cognitive code is a serious acquisition target by htc and comcast, it moves for exclusivity of Silvia™ intellectual property in the defense industry with a 10-50 million dollar licensing agreement - that cognitive code defendants have, upon information and belief, misappropriated and embezzled with such funds being stashed overseas.

127.     During the middle of December 2011, HTC execs flight out to Los Angeles and meet with Spring and he tells Plaintiffs the meeting went great and they were drooling.  Mimi Chen sends Plaintiffs an email thanking him for getting the company up and running on December 12, 2011. HTC's true interest in the

company was their desperate for our patent in order to fight off Apple. Cognitive Code's patent had received the Notice of Allowance which basically meant the patent was going to be issued in a few months.

128.      In this email, Defendant Spring unequivocally states that the 10 million dollar licensing agreement from Northrop Grumman with 6 million to be paid to the corporation in January 2012. Subsequently, after the emergence of Difazio during March 16, 2012 Difazio during the conference call will say the Northrop Grumman deal wasn't finalized and "wasn't as lucrative as originally thought… it was only worth 600,000 or 700,000 dollars…".  This is one of many material misrepresentations by Co-Conspirator Sal Difazio.

129.      Furthermore, despite the unambiguous language of Spring stating the 6 million had already been "booked" in the December 12, 2011 email to Odish, and General Counsel Difazio repeated assurances that no contract has been executed.

130.      In an email to Jeff Bezos, the founder of Amazon.com, Mimi Chen specifically uses the word "partnership" to describe the business relationship between Cognitive Code Corporation and Northrop Grumman.

131.      During December 2011, Spring reaffirms that the option rights held by cranbrook are valid because the LLC, an affiliate of the company, are valid because of two weeks of formal issuance of patent.

132.      Spring states to Odish in december 2011, admits to Plaintiffs odish that the 6 million [initial payment of licensing agreement] coming from Northrop Grumman in january 2012, Spring admits that he and defendant mimi chen already had plans for the 6 million and they were planning to invest the money in very conservative investment devices.

133.      Upon information and belief, they received the six million and refuse to acknowledge receipt of such funds. And this is why they cannot go through discovery. Plaintiffs objected slightly, reminding Spring that the 6 mm dollars belonged to the company. Spring shrugged it off and did not comment.

134.      **The 10 million from NG is likely 50 million dollars, and has been buried and embezzled in overseas accounts**. Upon strong information and belief, the "10 million from Northrop Grumman" that Plaintiffs were told was coming was in fact likely to be 50 million dollars from Northrop Grumman given a conversation that Plaintiffs would have Difazio on February 9, 2012 as stated below.

135.      During the First Week of January 2012 Plaintiffs travels to Los Angeles to spend time with Spring and Mimi Chen. During dinner on January 2, 2012, Spring stated to Joseph Plaintiffs that Jerry Waugh of NG was releasing money to the company while "they negotiated the licensing agreement".

***January 4th, 2012 Phone call from Spring to Plaintiffs: HTC wants to buy at least 51% of the Company and Chrysler and Fiat may be shipping 3 million units in the Summer of 2012***

136.      Plaintiffs is still in Los Angeles on the 4th of January and he wants to arrange a lunch with his friend Phil Huml, whom has access to Wistron, arguably

the world's largest OEM. A potential licensing deal or any business arrangement with Wistron would significantly increase the valuation of the company. Spring calls Plaintiffs on this day of January 4th, 2012 and tells him he has some "great news" and makes the following extremely significant admissions and statements:

137.     Spring states that HTC definitely wants to buy at least a 51% stake in the company, if not the entire company. Spring states also that Chrysler and Fiat want to ship 3 million units of our software this summer (summer of 2012), a statement consistent with the December 12, 2011 email Spring wrote to Plaintiffs regarding the state of the business.

138.     Additionally, Defendant Spring states to Plaintiffs that HTC - the world's 3rd or 4th largest cell phone manufacturer - "wants to be in the automotive business and Chrysler wants to be in the cellular business". Spring continues and states "isn't this amazing that our small company is the hub for all these huge things".

139.     It is during this call on January 4th, 2012, that Spring for the first time in a long time brings up the issue of Plaintiff's dual signature rights and rights to review and approve every contract, saying "joseph, Plaintiffs need to clean up the record books".

140.     Plaintiffs say he is willing to consider it as long as the proper mechanisms are in place to protect the company and its shareholders so it couldn't be harmed by any disastrous contracts signed by John Chen. And that the company must abide by and follow corporate formalities. Essentially be run properly. Spring promises and assures Plaintiffs that he (Spring) will be running things out of Los Angeles and that John Chen will not be involved.

141.     **Spring then states something about how the Company is setting up new bank accounts with 24 hour service. Plaintiffs finds this statement odd and it is not the first time he has heard it.** Why would the company need 24 banking service? They schedule a lunch date the following day with Phil Huml, who has access to the largest engineering company in the world, WISTRON. However, before the call ends, Spring once again mentions how he's going to get his "consulting fees" and Plaintiffs is yet again convinced the Majority Shareholders are misappropriating Corporate funds for their own personal use, or worse just straight out embezzling and sending money overseas.

### JANUARY 5TH, 2012. SPRING STATES TO ODISH THAT COMPANY IS WORTH 400 MILLION.

142.     Plaintiffs and his friend Phil Huml and Plaintiffs have lunch with Spring with the express purpose of setting a meeting with Brian Groh, the head of North America for Wistron. Defendant Spring showed up unkempt as if he had just woken up. The lunch with Phil Huml for the following day to discuss the Wistron opportunity and meeting with Brian Groh, the head of North America of Wistron, an engineering behemoth who did 21 billion in sales and revenues in 2011. Plaintiffs set up lunch with Phil Huml for the following day to discuss the Wistron opportunity.

143.     **Lockheed Martin inquires about the technology.** On the way to the sushi restaurant, **Spring mentions that a second billion dollar defense company had contacted them**. When Plaintiffs asked who it was, Spring refused to answer.

144.     Upon information and belief, that company was Lockheed Martin.

145.     During lunch Spring speaks openly to Huml about the impending HTC deal. Huml asks him what the company is worth and Spring replies, "400 million dollars". This is a realistic number given that HTC paid 300 million US dollars for a 51% stake in Beats Audio only six months prior - and that was not their core business. When Huml asked about the management of the company, Spring said he had a four member management team (which contradicts sal's statements and actions in how they are willfully ignoring our board and management rights). Then Spring mentions yet again that the company is taking some measures to open up new bank accounts with 24 hour service.

146.     Huml asked about the present management team, Spring replied it was only four people – obviously referring to Bourbeau, Odish, Mimi Chen, and Spring as John Chen had not been heard from or cc'ed on an email or taken part in a board meeting since his fraudulent conduct in May of 2011.  John Chen had not yet reappeared.

147.     This comment disturbed Huml and Plaintiffs. Huml told Odish after they dropped Spring off that even the mere appearance of impropriety is unacceptable and why would he need to wire money at 2 am? Huml will provide an affidavit and testify under oath to these statements and incidents.

148.     Incredibly, the following day Spring blows off the corporate opportunity of meeting Brian Groh and Wistron for second time. He doesn't even have the courtesy to call Huml the following day. Spring had now repeatedly disregarded on multiple occasions corporate opportunities with two separate multi-billion dollar companies in Magna and Wistron.

149.     **Amazon email, "partnership with northrop grumman.**"  In a January 2012 email to Jeff Bezos of Amazon, Mimi Chen **refers to her relationship with Northrop Grumman as a "partnership**".

150.     Spring calls Plaintiffs and tells him that HTC thinks the SILVIA™ IP is better than SIRI's, and that Spring will be traveling to Tiawan at end of January. Then out of the blue a bold-faced lie "joseph, I thought you transferred your board seat to John?" which he damn well knew I hadn't and said "transparency is a courtesy". Plaintiffs had to send him an email immediately after saying that transparency to a fellow board member was a fiduciary duty.

151.     Plaintiffs Odish emails Spring telling him I know "he's freaked out about the dual signature requirement and they will address it when he comes back from Tiawan".

152.     Spring tells Plaintiffs Odish that the HTC executives made a number of very significant admissions to him: the HTC executives told Spring that Cognitive Code's Intellectual Property, patent and software was far superior to SIRI and that they needed the patent and intellectual property to fight off Apple in their ongoing patent wars being waged here in the United States. Plaintiffs was excited over the news but wanted to know more and who would be handling all of

this business, negotiation, etc. The subject of John Chen returning to the company came up it became awkward. Spring said the JV would handle all this business. Plaintiffs asked to be more involved and be entitled to more disclosure as Plaintiff Plaintiffs is a Board Member. Spring replied, rather absurdly, "Joseph, transparency is a courtesy".

153.    Then Mimi Chen fabricates a lie about Odish promising to give up dual signature at dinner. Odish tries to be polite, but she insists and lies some more.

154.    So the next day Odish emails Patrick Miller something very similar to what Odish had emailed him before about being more aggressive, subject to Spring's approval on the strategy. He says Joseph "please do not contact Barbara Pearson". Odish immediately replies, "Okay. I wouldn't do it unless we were all on board."

155.    Having returned home to Michigan, on January 12, 2012, Spring calls Plaintiffs and tells him the following good news.

156.    Spring had spoken to the Senior HTC executives and they wanted Spring to fly to Taiwan to meet with their engineers and the HTC acquisition and Portfolio Manager at the end of January to discuss the acquisition and train the engineers on our SILVIA software.

157.    ***SILVIA™ AND COGNITIVE CODE ARE  WORTH SEVERAL HUNDRED MILLIONS:"  On the weekend of January 13, 2012, Defendant Spring declares that Cognitive Code is worth "several hundred million dollars".*** *Spring admits to PLAINTIFFS'  FORMER PARTNER (BOURBEAU) that the Company is worth "Several Hundred Million dollars" now that HTC wants at least 51% of the Company.* That same weekend, Spring called Bourbeau and told him the great news about HTC and how they would be flying him to Tiawan to meet with the HTC Portfolio and Acquisitions Manager. Bourbeau asked what that meant to the value of our company if HTC were to purchase a 51% stake in the company, Defendant Spring replied "several hundred million dollars".

158.    In January 2012, Cognitive Code Defendants essentially start to harass Plaintiffs over his Dual Signature Rights, despite Plaintiffs not seeing a single contract in ten months. The last document or contract Plaintiffs had seen or reviewed [but he and Spring did not sign] was the OnStar [GM] Agreement in late April 2011.

159.    The first conversation between Plaintiffs and Difazio was testy and revolved around Plaintiffs' dual signature rights. Defendant Difazio, supposedly General Counsel of the Corporation, was immediately threatening "to seek judicial relief to strip Plaintiffs of his dual signature rights" were contractually granted to him and part of the bargain as well as a part of his stock rights.

160.    During the first call with Difazio as the new "general counsel" for Cognitive Code Corporation threatens to seek judicial relief of dual signature rights and screams at him over the phone in an obvious attempt to intimidate and harass Plaintiff Odish into giving up something so that CC Co-Conspirators can cover up their fraud. Difazio states to Plaintiffs, "you don't need to know everything."

161.     Difazio promised in this email and in phone conversations with Plaintiffs Plaintiffs that he would act ethically and in the best interests of the corporation. Difazio requested that Plaintiffs and send him "their version of the facts" and a

"wishlist" as to what they wanted to see accomplished. Difazio stated he already had the individual version of the facts but needed Plaintiffs in order to effectuate a resolution and draft a new shareholders agreement supposedly.

**162.**      Plaintiffs relied on Difazio's representations and began preparing their version of the facts and a supposed wishlist and their version of the events or "dispute". Difazio admits to Plaintiffs attorneys that he and John Chen are essentially running the company, a very disturbing proposition to Plaintiffs.

163.      On January 17th, 2012, Odish receives an email from Defendant Difazio. He has sent Odish a "Cease and Desist" on behalf of Cognitive Code.

164.      After the initial confrontation, Plaintiffs relied upon Difazio's representations that he would act ethically as General Counsel. On January 18, 2012, Difazio sent Plaintiffs an email stating that the Cease and Desist Letter he sent Plaintiffs "created no causes of action against Plaintiffs". On January 20, 2012, Plaintiffs sent Difazio an email stating that he wished to discuss a buyout of his shares, he had basically had it with this disturbing conduct and it had taken a significant toll on him.  Difazio asked Plaintiffs to compile "their version of the facts" and a "wishlist" of what they wanted to see done with the company. Difazio was in retrospect trying to conduct free discovery.

**165.**      Plaintiff Odish had told his Alabama attorney Patrick Miller - repeatedly, in multiple emails - that he wanted to assert damages on behalf of Cranbrook in November and December 2011 in the ongoing Alabama litigation against MEI DEFENSE TECH, the billion dollar defense parent company. In light of the ridiculous cease and desist that Difazio sent to Odish, he was precluded from doing so because he knew if tried they would lie and create some additional fabrications. Plaintiffs respected the Cease and Desist despite it being baseless.

166.      On a Monday February 6th, 2012, Shareholders Plaintiffs and Bourbeau had a conference call with their General Counsel Sal Difazio. During the call, Difrazio did not at that time reveal his lifelong friendship with John Chen. But during that call, General Counsel explicitly acknowledged that Plaintiffs and Bourbeau each owned five equity points in the company. When shareholder Bourbeau mentioned that Plaintiffs had only been given paper issuances of stock certificates dated April 11, 2011, General Counsel assured us that the issuance of the formal certificates was a mere formality and he would get those certificates out to us within the week or very soon. This was a fraudulent misrepresentation.

167.      On Feb 9th, 2012 at 4:58 PM, Plaintiffs had a phone call with General Counsel Sal Difrazio. The two spoke for some time. Shareholder Plaintiffs mentioned that he had offered to help Spring and Mimi Chen with their mortgage, Defendant Difrazio mentioned that "money is not an issue, Joseph, there is massive money coming into the company… you are going to be a very rich man, Joseph. Relax and take care of yourself… Now, I will need you to give up that dual signature requirement…".

168.      When Odish mentions his right to review and sign every contract and he asked to see the Northrop Grumman agreement, Difazio promised to send it to him. Difazio then said, **_"I told John Chen, you spend $200,000 on a 50 million dollar contract."_**

169.     Plaintiffs now realize that the ten million dollar licensing agreement that Spring had told him about from Northrop Grumman agreement was almost certainly to be 50 million dollars and not the original ten million dollar figure, which was a fraudulent misrepresentation.

170.     **FEBRUARY 28, 2012 - EXHAUSTIVE DEMAND LETTER SENT OUT TO DEFENDANT DIFAZIO BY PLAINTIFFS' ATTORNEYS BILL HORTON AND SEAN WALSH VIA US MAIL AND ELECTRONIC MAIL. DIFAZIO RESPONDS VIA US MAIL AND ELECTRONIC MAIL, AN EXAMPLE OF WIRE FRAUD.**

171.      In the demand letter, sent out for a legal and proper purpose pursuant to Delaware Corporate General corporate statutory law § 220, it specifically requested information related to the following corporations: HUWAEI, HTC, COMCAST, NORTHROP GRUMMAN**,** AMAZON, GENERAL MOTORS, CHRYSLER, FIAT, QUALCOMM, MATTEL, MAGNA, SONY, NBC, IBM, INTELLITAR, WISTRON, ETC. It was for a proper purpose and pursuant to Delaware Statutory Code § 220.

172.      On that same date of February 28, 2012, the US Patent for Cognitive Code was issued. Thus, pursuant to agreements signed by Spring and Partnership Co-Conspirators the Plaintiffs now had fourteen calendar days in which to exercise their option to acquire additional shares through Cranbrook LLC and secure 7.5% of non-dilutable equity in Cognitive Code company.

173.      On March 8, 2012 Plaintiffs rightfully exercise their Option to Purchase an additional 7.5 non-dilutable points (75,000 shares) in Defendant Corporation Cognitive Code for $937,000.00 at $12.50 per share.

**174.**     Plaintiffs exercise of their option for additional 7.5% non-dilutable equity stake, bringing Plaintiffs original non-dilutable equity interest to 17.5%[ this includes the 5% Plaintiffs gave to Bourbeau on condition that he procure the 937k in option money which he did not]. The closing date set for the Stock Purchase Agreement was May 1, 2012 in the eastern district of Michigan pursuant to a forum clause provision.

      a. The stock purchase agreement on Plaintiffs' affiliate entity Cranbrook LLC (pursuant to Shareholder Agreement) showed **proof of funds of a seven million dollars** in a capital account by a close relative (and attorney) of Plaintiffs, thus showing legitimate proof that Plaintiffs had access to close and fund Cognitive Code pursuant to the Letter of Intent.

      **b.** The Stock Purchase Agreement from Cranbrook also had a forum clause here in the Eastern District of Michigan.

175.     On March 16, 2012, Plaintiffs' attorney Sean Walsh and the general counsel Sal Difazio held a conference call to update Plaintiffs' attorney.  The call was designed to have our supposed General Counsel update Plaintiffs on where things stood with the Corporation and all the terrific opportunities that were taking place. But during the call Difazio continued his pattern of harrassment, in a veiled attempt to extort Plaintiffs into giving up his dual signature rights. Additional

statements and representations made by Difazio during the call include the following:

a. *Difazio stated that the Corporation was on the verge of "signing three huge deals, one particularly significant."*

b. In willful violation of basic corporate laws and governance, Difazio refused to disclose or name any of the companies related to these "three huge deas", though one was obviously Northrop Grumman. Such refusal of disclosure regarding material information is a breach of his fiduciary duty.

c. Difazio stated that "they" (Spring, Mimi Chen and John Chen) reject the demand for the option.

d. Difazio then stated that if Plaintiffs Odish wanted his formal stock certificates he had to agree to give up dual signature rights, board seat, and the anti-dilution provision that protect his shares from being diluted. Difazio stated "so, sean, if the company is worth  500mm? these guys think there are entitled to 50mm? oh, c'mon.." - This statement by Difazio constitutes and supports a rule 10(b)(5) action because - Difazio then admitted that he was not just acting as General Counsel but he was in fact, with John Chen, "leading up" the charge to find people to negotiate the contracts. He essentially admitted that he and Chen were running the company out of New Jersey, a fact Plaintiffs find deeply troubling;

e. Difazio admitted his primary participation in running the Corporation now as he said he was actively involved in finding a company to help negotiate deals moving forward… that there had been too much patience in getting a deal done. Marketing and negotiations will be handled by a 3rd party. Plaintiffs did not know it at the time but upon receipt of April 30, 2012 documentation as discussed below, the third parties heading up this negotiation or special committee were the individual Morgenthaler family members: Gary Morgenthaler, Todd Morgenthaler,  Gaye "Lissa" Morgenthaler and David Jones.

f. During March 16, 2011 call,  Difazio admits HTC had made a formal tender offer or [DEMAND] for the Company and had given Spring "a number" but refused to disclose what that number was, but that Spring had countered with his number and HTC said Spring's number was too high and preferred to acquire a majority stake, 51%. Again, Difazio refused to say what the numbers were, but upon information and belief, Spring asked for "700 million dollars" the latest valuation number he had stated in January 2012.

g. Defendant Difazio then fraudulently states that Northrop Grumman deal is likely dead and it won't be worth anything more than "only 600,000 or 700,000 dollars".

h. Difazio NEVER states that NORTHROP GRUMMAN had developed the prototype for Chrysler. What Defendant Difazio didn't know was that Plaintiffs was aware of the fact that **NORTHROP GRUMMAN had created a prototype car-vehicle employing SILVIA ™ for Chrysler and NORTHROP GRUMMAN had created a prototype cellphone employing SILVIA™ for HTC.**

176.    Upon information and belief, and certain tax documentation and bank statements, Cognitive Code Conspirators likely with the knowledge of DEFENDANTS have been misappropriating and embezzling corporate funds for their own personal use, while also intentionally violating federal currency transaction reports that financial institution are required to file. They have also of course as stated in herein previously set up overseas and offshore accounts and likely buried the 50 million from Northrop Grumman into an offshore account.

177.    Subsequently, the parties agree to an April 17th Inspection date of books and records in the headquarters in New Jersey at Difazio's office. Difazio would lie and cancel. Then Difazio would promise to come to Detroit after flying to San Francisco to meet with Nixon Peabody on April 25th, but that was also a false promise, and other instances of mail and wire fraud.

### a. NEARLY ALL OF THE PHONE CONVERSATIONS AND WRITTEN CORRESPONDENCES FROM DEFENDANT DIFAZIO CONSTITUTED MAIL AND WIRE FRAUD AS HE USED THE MAILS TO SEND OUT THE CORRESPONDENCES BUT ALSO SENT THEM THROUGH ELECTRONIC EMAIL WIRES.

178.    On March 27, 2012, Difazio sends Plaintiffs' attorney Sean Walsh a formal correspondence essentially stating that they have no intention of performing on the Option to purchase the additional 7.5 equity points because "it had lapsed". This material misrepresentation in writing by Difazio completely contravenes the representations made by Spring in late November 2011 when he told Plaintiffs that their Option rights were absolutely still valid as the patent had not yet been issued.

179.    **On or about March 27, 2012 Difazio, as general counsel of Cognitive Code makes an offer**

180.    This was a personal offer made by Difazio, not the corporation, to Plaintiffs' attorney and almost certainly backed up the Morgenthalers. Under Delaware law, the buyout of a minority shareholder's shares must come with full disclosure. And given the valuation's being thrown around by Spring and Chen and the others, the shares were worth enormously more money than five million, if not more - based upon projections from Spring and valuation opinions as the company was a target acquisition by two multi-billion dollar companies.

28

181.     **Nixon Peabody and the SEC relevance for "ONE EMBARCARDERO CENTER".** On April 4, 2012, attorney Walsh sends a written correspondence to Difazio.

182.     On April 10, 2012, attorney Walsh sends a written correspondence to Difazio. Two of these correspondences references the fact that difazio is flying to san francisco to meet with Nixon Peabody.

183.     The morgenthalers are in San Francisco. And NIXON PEABODY is one of the four or five global law firms that represent them. On April 10, 2012, Plaintiffs attorney Walsh sends Difazio a written correspondence.  On April 12, 2012, Plaintiffs Attorney Walsh sends  Difazio another written correspondence. In these correspondences Plaintiffs's attorney Sean Walsh urges Difazio to respect Plaintiffs's lawful contractual rights and status as a lawful shareholder and Board Member of Cognitive Code Corporation.

184.     These correspondences reference NIXON PEABODY on two separate occasions. These correspondences, like the rest of the documents and emails in Plaintiffs Odish's possession create an important "paper trail"  of the facts and the circumstances of the bringing of this action.

185.     All the dates of inspection of books and records. Several weeks pass and Difazio had not sent a single document pursuant to the exhaustive Demand Letter sent by Plaintiffs attorneys. Difazio cancelled the April 17th, 2012 inspection. Difazio then promised he fly to detroit with the Book and Records on April 25, 2012 but this was yet another empty and false promise.

186.     On April 30th, 2012, Difazio sends Plaintiffs attorneys a mere fraction of the documents requested and not a single contract or even draft of a contract.

187.     In April 30th, 2012 Difazio writes in a letter to Plaintiffs attorneys that Plaintiffs's board seats and dual signature rights are "mere perceptions".

188.     The warrants sent by Difazio were fraudulently backdated. And the warrants were issued only weeks after Plaintiffs exercised their Stock Option Rights at 12.50 per share. The documents display Difazio issued warrants to himself, to Gaye Morgenthaler, David Jones, for a price per share less than the option price Plaintiffs were prepared to pay for the 7.5 non-dilutable equity points. [See Issuance of the backdated Warrants which were issued for a price less than what Plaintiff LLC was prepared to pay.]

189.     Plaintiffs showed proof of funds of 7 million dollars, and these funds are from a close family relative of Plaintiffs who also serves as his attorney and attorney for his family. See Exhibit B-2, Lawful Exercise Plaintiffs Cranbrook LLC's rights to purchase 7.5% of Cognitive Code stock for $937,000. The proof of funds of 7 million far exceeded the 2.5 million contemplated by Original Letter of Intent.

190.     A warrant is a contract - and every contract must be reviewed and signed by Board Member Plaintiffs Odish and Spring per the contractual addendum, a contractual right that flows with his stock rights.

191.     As the Cognitive Code Conspirators engaged in serious misconduct of misappropriation and embezzlement of corporate funds as Plaintiffs would ultimately learn, that dual signature right was a problem for them and a source of the retaliation against Plaintiffs.

192.    For a General Counsel to freeze out a Board Member who possesses dual signatory rights in order to issue fraudulently backdated warrants is outrageous. Moreover, they were executed without Board Member Plaintiff's signature and with John Chen's signature making them legally null and void.

193.    The April 30, 2012 documents submitted by Difazio show that the stock options/warrants issued to Gaye Morgenthaler and David Jones, in lieu of putting Gary Morgenthaler's name on them, is essentially one of many likely violations of statutes.

194.    Plaintiffs had offered $12.50 per share for the exercise of their stock option rights. By the April 30, 2012 submission of documents, it is clear that one day prior to sending the Rejection Letter on March 27, 2012, Difazio and the three other founders-directors issued warrants to Difazio and other individuals at significantly less an amount than Plaintiffs option price. See Index of Exhibits, Issuance of Warrants. And these warrants were fraudulently backdated with an exercise date of November 1, 2011. There were additional disturbing factors of the documents emailed by Difazio to attorney Walsh as stated below.

195.    **Fraudulent Misrepresentations and inconsistencies upon the Corporate Stock Ledger**. The Corporate stock ledger showed Plaintiff's name on it. Additionally, the corporate stock ledger provided by Difazio had fraudulent entries besides the stock warrants. Laura Pelletier had loaned the company 50,000 dollars which was converted to stock. She only owned ten thousand shares, but Difazio fraudulently gave her debt instrument and treated as an equity purchase from 2009, giving her an additional 10,000 shares she does not own. The word "ownership" was also misspelled on the document.

196.    **The Financial Statements Provided by Difazio**. In addition to the fraudulent entries on the corporate stock ledger, Difazio sent financial statements of the corporation which had obvious fraudulent entries, such as the Peter Winslow entry.

197.    **Fraudulently backdated Stock Warrants** issued to Difazio and Gaye "Lissa" Morgenthaler and her husband David Jones. The stock warrants the Difazio to himself, and two of the Defendants.

198.    **Fraud Upon the Transaction Log submitted by Difazio**.  Difazio submitted a transaction log for the corporation that stated it was current through Dec 31, 2011 but in a rather absurd fashion, the transaction log cut off somewhere in the middle of 2009. It was an intentionally utterly incomplete document.

199.    Upon information and belief, Defendants instructed Difazio in exercise of control authority to engage in intentional dilution and issuance of bogus stock warrants to prevent the Cognitive Code Company from Plaintiffs's LLC having or being able to lawfully exercise its right to purchase the additional non-dilutable 75,000 shares for $937,000.00 at a per share price of $12.50. The fraudulently issued warrants to Difazio and two of the Defendants were issued to them at a heavily manipulated price which would constitue a "kickback" in violation of the anti-kickback statute, at prices of $5.00 per share and $7.00 per share as delineated below and in the March 26, 2012 "Consent in Lieu of Meeting of Directors".

200.     The stock options/warrants were executed on March 26, 2012, after Plaintiffs' LLC (Cranbrook) lawfully exercised it's option rights on March 8, 2012 and these stock options and warrants were fraudulently backdated to November 1, 2011.The stock options and warrants from March 26, 2012 document sent to Plaintiffs's attorney Sean Walsh on April 30, 2012 were in part listed as follows: SAL DIFAZIO granted himself 5000 shares at $7.00 per share with an expiration date of October 31, 2015 and a fraudulent backdate of November 1, 2011, and an additional 2,000 shares to himself for $ 5.00 per share. 10,000 fraudulent stock options/warrants were issued each to Gaye Morgenthaler and her husband David Jones at a price of $ 7.00 per share, for a total of 20,000 shares to Gaye Morgenthaler and her husband.

201.     The entire list of fraudulent stock options/warrants totaled 33,000 shares and distributed as shown in the document, herein attached and incorporated in Index of Exhibits, Cognitive Code Corporation's March 26, 2012, List of Fraudulently Backdated Stock Options issued to destroy Plaintiffs' LLC rights in acquiring an additional 75,000 shares.)

## JULY 5, 2012 - FORBES MAGAZINE ARTICLE ON COGNITIVE CODE "Riding the Wave of Artificial Intelligence". Article states Cognitive Code is in business with Northrop Grumman and Chrysler.

202.     On July 5, 2012, Cognitive Code was featured in Forbes Magazine and specifically stated that the company was in business with Northrop Grumman and "one of the big three", which is Chrysler,

203.     The article also mentions that Cognitive Code defendants and had received money from an "angel investor". The "angel investor" is Gary Morgenthaler and Defendants, who wrongfully and illegally exploited MATERIAL, NON-PUBLIC information in violation of insider trading laws and then used that misappropriated information [that Cognitive Code was about to be acquired by APPLE competitor HTC] and realized that CC's SILVIA technologies and virtual artificial intelligence software [as perfected by Northrop Grumman's engineers] actually did work and decided to "gut" and misappropriate the IP/Patent and technology for himself and his VC company, and upon strong information and belief, for APPLE given Morgenthalers close and long-term relationship the tech giant.

204.     The FORBES article on Cognitive Code Corporation and Defendant Spring Spring has specifically acknowledge the Cognitive Code is in "business with Northrop Grumman, one of the big three (which was obviously known to Plaintiffs to be Chrysler) and an angel investor".

205.     Difazio represented to Plaintiffs counsel via telephone and subsequent letter on June 6, 2012 that he had fully complied with the Demand Letter and sent documents to Plaintiffs previous counsel. This perhaps would have been a more convincing round of subterfuge if he had overnighted the documents to previous counsel instead of emailing them, leaving himself very little wiggle room.

206.    Defendant Spring said to Plaintiffs in December 2011 that Plaintiffs and Bourbeau were - in complete contravention to the contractual grant of their stock - going to get tagged and 1099'd each for 250,000 dollars for a total of 500,000 dollars. They backed off this when it became obvious that their "advisors", upon information and belief, told them this would constitute massive tax fraud.

207.    **Subsequent revelations after April 30, 2012 submission of documents by Difazio - Fraudulent concealment and actions of Cognitive Code Co-Conspirators**. These revelations of fraudulent actions by Defendants and Partnership Co-Conspirators prove unequivocally that they never had any intention of ever performing on their agreements signed with Plaintiffs, creating an undeniable securities fraud claim under 10b5. At the time of filing of this action, the  still have not tendered Plaintiffs their Formal Stock Certificates, again at the control of the Defendants.

208.    They withheld the material fact that they had executed another agreement only five days [March 1, 2011] before the Plaintiffs Cranbrook LLC's Letter of Intent.  See Prescient Capital Group Agreement.The revelation that Defendant John Chen had signed this Agreement was fraudulently inducing Plaintiffs Odish to agree and sign the Newman agreement that initially obligated to pay Newman $175,000 US dollars upon funding but then exposed Plaintiffs Odish to "damages above and beyond that amount", constitutes a 10b5 violation, as it is clear that Cognitive Code Defendants from the get-go never had any intention of performing on the contract.

209.    Despite all other resolutions and appropriate corporate docs being signed, Plaintiffs still does NOT have his official and formal stock certificates. They have been trying to extort him into giving up his rights for those certificates, constituting other acts of retaliation based solely on the fact that Plaintiffs Odish, as an attorney, wanted the company to be run in a proper and lawful manner. Cognitive Code defendants wanted the company to run like their personal slush fund.

210.    For much of year while working to save and build the tech startup, Plaintiffs Odish also assisted Patrick Miller, Alabama Counsel for Plaintiffs Odish and Cognitive Code in those proceedings.  Spring admitted this to Plaintiffs in October 2011 that the ten points they had offered him were being used to assert additional damages against Intellitar and its parent company MEI DEFENSE TECHNOLOGIES, INC in the Alabama litigation.

211.    Patrick Miller in those Alabama proceedings asked Odish to sign **two separate sworn affidavits** which stated he was a shareholder in the company and those affidavits were used in the proceedings.

212.    Patrick Miller and Robert Rosen would NOT use those sworn affidavits in the LA proceedings.

213.    Furthermore, despite owing Odish and Cranbrook a fiduciary duty as their counsel, Miller willfully breached and engaged in a manipulative scheme at the behest of Cognitive Code Defendants as soon as the DEMAND LETTER was sent out in late February 28, 2012 - as Miller immediately, in conspiracy with Difazio, filed a protective order in the Alabama action at the request of the Morgenthalers.

a. Judicial Estoppel

b. Interrogatories name Odish as a shareholder.

c. Two Sworn Affidavits

d. Mail and Wire Fraud by Defendants: Use of Verizon Records and Emails to disqualify MEI's Alabama defense counsel.

214.    Perjury on Delaware State Annual Franchise Tax Filings made by Defendant John Chen and Cognitive Code defendants. Odish would inform Defendant Rosen of this perjury and he would do nothing.

215.    Chen filed these state documents in the commission of perjury and stated that the company has Zero members on the board of directors for year of 2012, filed on February 2013. John Chen committed perjury for 2012 filing when he didn't name Plaintiffs as a Board Member as required by the State of Delaware Annual Franchise Tax Report, 502(b), filed under penalty of perjury.

216.    **Morgenthalers on the Cognitive Code Advisory Board.** In the emails in possession of Plaintiffs, the Cognitive Code Partnership Co-Conspirators usually refer to Gary Morgenthaler, his siblings and David Jones as "their advisors".

217.    Cognitive Code's website listed Gaye Morgenthaler and her David Jones as members of the ADVISORY BOARD of Cognitive Code. a. "de facto" partnerhip, "enterprise" and association as contemplated by the state and Federal Civil Rico Statutes.

218.    The disturbing nature of the prior proceedings (first in Alabama, then in Los Angeles) references the actions of Plaintiffs' own (former) attorney Robert Rosen and opposing counsel representing Cognitive Code, Howard Fredman, who have acted in collusion to protect their own interests and the interests of the Defendants.

219.    As stated in the introduction, Plaintiffs hired a top securities fraud attorney in Los Angeles, California on August 17, 2012 to pursue his civil damages against Cognitive Code Co-Conspirators and Defendants.

220.    Plaintiffs hired Attorney Robert Rosen, an attorney who was certified as securities fraud expertise and had been licensed to practice law since 1970. Plaintiffs was born in 1969 so the attorney he hired had over 40 years of commercial litigation experience.

221.    The engagement called for Rosen to represent Odish in either Michigan or California.

222.    Attorney Rosen who filed a federal complaint against Cognitive Code conspirators for 175 million US dollars in damages and in first complaint only Cognitive Code Defendants on October 22, 2012.

223.    The proceedings as a result of Plaintiffs's own attorney and the opposing counsel, Howard Fredman, who represented the Cognitive Code Defendants were deeply disturbing and compromised.

224.    Not a single federal claim and virtually no discovery was done. Almost immediately after filing the complaint, Plaintiffs realized that his attorney Rosen had a serious conflict with Jerry Newman and he should have never accepted the engagement. Newman was expected to be named never was and Attorney

intentionally breached attorney-client privilege by communications with Newman in early November 2012 only a few weeks after filing the complaint.

225.     Plaintiff's wife was expecting their second in late January 2013 and his daughter was born on January 30, 2013. Subsequent to that, Plaintiffs actively sought new counsel but it was extremely difficult as his friendship and relationship with Bourbeau had broken down.

226.     Attorney Rosen without seeking Plaintiff's consent signed a protective order in the matter. Then, in late January 2013-early February 2013, Gary Morgenthaler was sent a subpoena by Attorney Rosen.

227.     In February 2013, Attorney Rosen sent Plaintiffs correspondences that he "was propounding discovery". Plaintiffs sent Rosen a number of emails over the next few months inquiring about the status of any Subpoenas to all the relevant entities including Northrop Grumman, HTC, Comcast, Chrysler. Several months later, Odish would learn Rosen never sent a single subpoena to any of these entities, an outrageous act of silent fraud by an attorney towards a client.

228.     The deadline for amending the complaint and adding and naming new parties was April 8, 2013 per the scheduling order. Rosen waited until the few days before this deadline to inform Plaintiffs he was not naming any of the Morgenthalers. Plaintiffs was deeply upset by this omission and it only confirmed that his attorney was compromised.

229.     **A Single Page of Discovery**. After fourteen months of civil litigation, the entire scope of discovery attorney Rosen had conducted could be summarized in a single page: John Chen's Resignation Letter from June 2011 that Plaintiffs had insisted comport with the truth. This was the only document Fredman, Defendant Difazio and CCC defendants produced after a year.

230.     Rosen does not send a single subpoena to a single business entity. In another disturbing disturbing revelation, Plaintiffs' learned in June of 2013 after several months of filing the complaint that his Attorney had not sent a single subpoena to Northrop Grumman, HTC, Chrysler, Comcast or any of the entities listed in the Demand Letter and the voluminous emails and documentation. Rosen had filed a complaint for 175 million dollars and not sent a single subpoena to a single business entity.

**JUNE 11, 2013**

231.     On the exact date of June 11, 2013, Plaintiffs were deeply disturbed by the revelation that his attorney Rosen had lied to him about "propounding discovery" and did not send a single subpoena to Northrop Grumman, HTC, Comcast or any other company listed in attorney Walsh's Demand Letter of February 28th, 2012, Plaintiffs continued his diligence in doing research into securities laws and for first time used the EDGAR feature on the sec.gov website.

232.     Plaintiffs stumbles on sec.gov and for first time in June 2013 starts scouring the "Edgar" function on the SEC site. As perhaps stated previously herein, Plaintiffs is a real estate and transactional attorney. As his attorney Robert Rosen was and is one of the top securities attorneys and a former

attorney for Securities and Exchange Commission during the 1970's, Plaintiffs reasonably relied upon his expertise in the area of securities fraud and other matters.

233.    On that date of June 11, 2013, Plaintiffs learned the Cognitive Code defendants/conspirators had filed a Fraudulent Sec Reg D Form. They only filed their Reg D filed November 29, 2012, after the filing of our action in October 2012. Then Plaintiffss learned that John Chen committed two counts of perjury for 2012 and 2013 filings when he didn't name Plaintiffs as a Board Member as required by the State of Delaware Annual Franchise Tax Report, 502(b), filed under penalty of perjury. And the 2013 filing was absurd because Defendant Chen filed that report and named "zero present directors" running the company.

234.    On June 11, 2013, Plaintiffs went onto the SEC website and for first time used EDGAR research function. Plaintiffs is not a securities fraud attorney and was not aware of this search feature. On this date and using the EDGAR function Plaintiffs for first time saw that Cognitive Code Defendants had made a filing with the Securities and Exchange Commission, a REG D FORM that contained a multiple fraudulent statements in the document. See Index of Exhibits. The date of "6/11/13" is listed in the left hand corner of the print off of the SEC filing.

235.    The fraudulent REG D FORM filed by Cognitive Code Defendants was filed on December 20, 2012, nearly two months after the filing of the California complaint Plaintiffs's attorney, Rosen. It is well settled that the intentional misstatements or omissions on documents with the Commission can constitute a Title 18 U.S.C.S. § 1001 violation.

236.    [It is patently obvious to determine that the Reg D Form has intentional fraudulent misrepresentations made by Cognitive Code Defendants by simply comparing it the Corporate Stock Ledger Difazio had created and sent Plaintiffs Odish's attorney Sean Walsh.]

237.    Plaintiff Odish immediately informs Rosen and specifically asks him as an attorney with 43 years of legal experience in securities fraud if he and the other members of his law firm had scoured the SEC website for any relevant information related to this matter.

238.    Rosen informs Plaintiffs that they "scoured the SEC website" and had found nothing. This was a fraudulent misrepresentation from an attorney to his own client.

239.    Plaintiffs would learn during the important months from October 2013 through December and into January 2014, that this was one of many lies and fraudulent misrepresentations by Plaintiff's own attorney to his client.

240.    On or about August 1, 2103, Plaintiffs caught his attorney Rosen in yet another lie regarding the matter and disgusted by this Plaintiffs tries to "fire" his attorney and asks for his immediate withdrawal. His withdrawal is mandated by california court rules and case law. But in extremely bizarre manner, Rosen refuses to withdraw from the matter. While the matter of his disqualification commences pending in August of 2013, Plaintiffs emails opposing counsel that represents Cognitive Code Defendants.

241.    As Rosen refused to even acknowledge this, Plaintiffs was informed that his securities causes of action against individual Morgenthalers were still very

valid and he could pursue them as a separate action. Thus, Plaintiffs began work on a separate and distinct action against the morgenthalers and continued research and diligence.

242.    **Keenly Aware of Plaintiffs's Rights and Actions, the "Defendants" take preventive action to construct false affirmative defenses by false and fraudulent filings with the SEC.** On August 27, 2013 and again on August 28, 2013, on two separate occasions Plaintiffs emails attorney Howard Fredman and specifically states his intention to file an action against the Morgenthalers in Eastern District of Michigan and perhaps consolidate the two actions. See Index of Exhibits. In the previous "90 days" of the calendar year of 2013 (and subsequent to the filing of Plaintiffs's own barebones complaint which constituted the original complaint in this action on date of September 19, 2013), Plaintiffs would come to learn that less than two days after Plaintiffs had emailed Attorney Fredman, Gary Morgenthaler and his lawyers on August 30, 2013 filed a bogus document with the SEC a document effectuating a "10b5-1 trading plan" on his behalf, through their PEREGRINE SEMICONDUCTOR entity that they had funded and controlled.

243.    It is of importance to note that in late November 2013 the Department of Homeland Security raided Peregrine for matters unrelated to those referenced herein, but strengthens the proposition of a disturbing "Morgenthaler" Enterprise.

244.    Upon the discovery in November 2013 of this August 30, 2013 SEC Morgenthaler filing that was almost certainly a result of the emails to attorney Howard Fredman, Plaintiffs - not knowing what a 10b5-1 trading plan as he was still not a securities fraud attorney - learned from his own diligence that a "10B5-1 TRADING PLAN" is a device used by executives to create an affirmative defense to claims of INSIDER TRADING.

245.    **Both Rosen and attorney Fredman Cognitive Code Defendants tell Plaintiffs Odish that Cognitive Code is broke and has no money**, and has yet to sign any agreement - statements which are absurd in light of the Public documents a judge or court could take judicial notice such as the FORBES ARTICLE or MIMI CHEN'S TWITTER ACCOUNT [in which she has spent last two years telling the whole world all the deals they are signing].  The was the most disturbing component of what took place in those proceedings was the fact that Plaintiffs's own attorney, Rosen, and opposing counsel Fredman tried to convince Plaintiffs that Cognitive Code was "broke", there "was no money, the technology was worthless and "no agreements had been signed". Not with Northrop Grumman. Not with HTC. Not with the Morgenthalers.

246.    These assertions were being made despite the fact that judicial notice could be taken of the Forbes Article from July 2012 that specifically stated Spring and Cognitive Code was in business with Northrop Grumman, "one of the big three automotive companies" (which Plaintiffs knew was Chrysler even before the recent material revelations).

247.    Upon recent factual revelations within the last few months prior to the filing of this amended action, it has become clear that the Defendants were closely monitoring the proceedings but Plaintiffs' actions in this District as well for reasons delineated herein.

**248.**     On August 27, 2013, finally and desperately breaking free from attorney Rosen, Plaintiffs sent opposing counsel Howard Fredman an email expressly stating his intention to file a complaint against the Morgenthalers and consolidate the two actions. During the crucial month of November 2013 less than a few months from date of filing of this amended complaint and during a period where Plaintiffs was working day and night to uncover just how far the "rabbit hole" goes, he came across this filing on the sec.gov website: on August 30, 2013, that same day, keenly aware of Plaintiffs Odish's actions Gary Morgenthaler files with the SEC a 10b5-1 Trading Plan. Plaintiffs odish does not learn of this filing until November 2013.

249.     At the time of the filing of the original complaint, Plaintiff was not aware of the material facts he discovered in later and would continue to discover up through the filing of this action. Plaintiffs was not aware of the NUANCE and PEREGRINE liability.

250.     But Plaintiffs continued to do research on Lexis Nexis, enormous amounts of research and then revisited the SEC website when in early October 2013 he discovered the filings and actions of the Defendants that would necessitate the amending and consolidation of this action.

251.     Plaintiff Odish first learns of the unlawful misappropriation and evil scheme by the Morgenthaler-related SEC filings, first Nuance then sees the Peregrine filing.

252.     Plaintiff realized he could not trust anything his attorney Rosen had told him about this matter so he revisited the SEC EDGAR website for additional SEC complaints to model the action over when he reviewed RECENT SEC FILINGS.

253.     Plaintiff was genuinely shocked and disturbed to read in NUANCE'S SEC FILINGS a list of companies that match the companies listed in the FEBRUARY 28, 2012 DEMAND LETTER that his attorney Sean Walsh had sent out to Defendant Difazio.

254.     Both PEREGRINE (PSMI) and Nuance Communications, Inc. (NUAN), a multi-billion dollar publicly traded entity that was funded by Morgenthaler Ventures and as stated in Leslie Spring's email to Plaintiffs Odish had Gary Morgenthaler on its Board was effectively being used [as PLAINTIFFS ODISH would learn over the next two months] as one of many either private or publicly traded entities that Gary Morgenthaler and Defendants were in conspiracy with the Cognitive Code Co-Conspirators being used to generate enormous revenues through the unlawful and fraudulent use of stolen IP which was now being used on PLAINTIFFS AND EVERYONE ELSE.

255.     But the fraud being perpetrated directly against and as result of Plaintiffs Odish's contractual stock and dual signature rights was also now a multi-billion dollar fraud upon Federal act, as well as highlight the numerous SEC violations and numerous federal securities laws violations, as this was undeniable proof of a classic Insider Trading case - the "wrongful use or misappropriation of MATERIAL, NON-PUBLIC INFORMATION".

256.     THE MORGENTHALER NUANCE SEC 10-K FILING FROM SEPT 30, 2013 in conjunction with Plaintiffs Odish's own personal documentary evidence, Demand Letter and other items unequivocally prove that Gary Morgenthaler and

Defendants in civil and criminal conspiracy with Cognitive Code Co-Conspirators unlawfully misappropriated MATERIAL, NON-PUBLIC INFORMATION (the information being that Cognitive Code was an acquisition target and was to be purchased by HTC and COMCAST, Two entities that are now disturbingly and unlawfully "embedded" as customers of NUANCE) and exploited it for their own tremendous gain.

257.    While this constitutes illegal and unlawful insider trading per the SEC rules, this is far more egregious than trading the stock. Gary Morgenthaler and the Defendants exploited their access to this Material, Non-Public Information and then essentially manufactured an unlawful scheme to use this Cross Platform technology in multiple entities that they control and generate potentially billions from the Defense Sector, Heathcare, Mobile/Cellular, Automotive Telematics, Toys, Gaming, Medical, Enterprise Solutions, Cloud etc.

258.    SIRI was a bust as Artificial Intelligence so the Defendants had to unlawfully misappropriate true artificial intelligence technology in form of SILVIA.

259.    It must be stated that at no time where there any a) shareholder vote held regarding the sale of the company, or b) any shareholder vote regarding any business ventures with the Morgenthalers. This was true and absolute WILLFUL NON-DISCLOSURE BY COGNITIVE CODE CO-CONSPIRATORS.

260.    A Detailed Review and verbatim recital of SEC 10-K FILING DATED SEPT. 30, 2013 is necessary to appreciate the fraud upon Plaintiffs OdisH. First and foremost, as stated above, the companies that NUANCE now could call a customer include the United States Army, HTC, ONSTAR [the last agreement Plaintiffs Odish was given by Cognitive Code Defendants in April 2011] Comcast, Amazon, Chrysler, Fiat, Mercedes, Denso.

261.    The unlawful misappropriation of Intellectual Property that the United States government paid for to help develop and create through payments to Northrop Grumman involved taking the SILVIA™, this multi-billion dollar artificial intelligence software with cross platform c**apabilities, and either embedd**ing it into their Dragon Nuance products or repackaging it as something new and calling it NINA™.

262.    So first there was SILVIA™, the original platform, and then Northrop Grumman develops Sadie™ and the Morgenthalers, in bed with Apple, and desperately needing the best and most cutting edge patents and intellectual property they can get their hands on, steal this IP and repackage it as NINA™ .

263.    Basically the Morgenthalers have used THEIR ENTITIES as an "intellectual property laundromats" and this is why there is word on the street APPLE will likely acquire Nuance in the not to distance future. They have to, it is making enormous money with the new digital assistant technology, but it is now a tainted publicly traded company.

264.    If there was any doubt that THE DEFENDANTS were keenly aware of Plaintiffs Odish's rights it must be stated that after reviewing the SEC filings and the website and seeing all same automotive companies that Plaintiffs was familiar with and conspicuous by its absence is MAGNA.

265.    Denso is on the Nuance website, but Magna is nowhere to be found. Because they know Plaintiffs Odish brought Cognitive Code SILVIA™ to Magna

and they wanted four licensing applications. [See the December 12, 2011 and December 16, 2011 emails from Leslie Spring to Odish about pitching the SILVIA software to Magna. So they specifically made a note not to approach Magna because Odish has a friend there and this would get back to him.

266.     Nuance's SEC 2013 filings also show that its customers now include APPLE and HTC, two tech giants that were formerly battling each other in court and around globe over patent infringement. As stated previously herein, in 2012 Apple and HTC subsequent to their 2011-2012 litigation entered into a quiet licensing agreement that upon information and belief is related to and potentially a result of the unlawful activities complained of herein.

267.     HTC's stock value has been destroyed as a result of the litigation with APPLE.

268.     **Relevant Sections from Nuance's September 30, 2013 SEC Filing lifted verbatim:**

→***We are a leading provider of voice and language solutions for businesses and consumers around the world. Our solutions are used in healthcare, mobile, consumer, enterprise customer service, and imaging markets.***

**269.**     Peregrine and NUANCE'S SEC 2013 FILINGS show their profits surging in 2013 by 'hundreds of millions of dollars' that strong and information and belief is a result of this unlawful misconduct and wrongful misappropriation of intellectual property.

270.     **Morgenthaler Actions are unlawful and exploitive of Plaintiff on the micro and programs on the macro,** which were created for the lawful and beneficial government interest of providing healthcare to americans, and has lawful and legimate government interest requiring the "digitizing" of health records, coding and compliance - which is absolutely being exploited by morgenthalers by the acts discussed herein. If there is any doubt, an interview in late November 2011 with Gary Little, partner in Morgenthaler Ventures, specifically states intention to exploit components of President Obama's ACA. In an interview with CNN Money titled the "Future of Morgenthaler Ventures", Little [unaware of the fraud that Gary Morgenthaler had commenced] states that the Venture Capital company had acquired a company called Practice Fusion, a business related to e-health records. Little specifically states the new law being pushed by President Obama and how it implements FOUR YEARS of incentives for companies

271.     There is no mention of cognitive code intellectual property and silvia in sec filings by Peregrine, Oncomed, Nuance or other Morgenthaler Entities. In extensive review of the SEC FILINGS there is absolutely no mention of the name of Cognitive Code. 2013 SEC FILINGS by Nuance and Morgenthalers mention extensive acquisitions of other entities, one for 100 mm, another for nearly 300 mm US dollars, but absolutely no mention of the name Cognitive Code or SILVIA™ IP technologies, for obvious reasons.

272.     Obviously given the fraud, Morgenthalers are not entitled to any Safe Harbor provisions in their SEC filings of any potentially tainted entity. Moreover, the evil and nefarious motive and Scienter is obvious: Morgenthalers

273.     Indeed, Gary Morgenthaler just set up a new entity called "MORGENTHALER TECHNOLOGY GROUP' that upon information and belief will also exploit the unlawfully misappropriated SILVIA IP.

274.     Obviously all of these filings submitted with the SEC are false seeking "approval" and as Plaintiffs continued to research this fraud he realized that Gary Morgenthaler and Defendants had created a deceptive scheme in an attempt to cover up their fraud and insulate him: improper use of CTOS, improper use of his Morgenthaler Ventures partners as "Straw Men" on a great number of false filings with the SEC, improper use of NIXON PEABODY San Fran office splattering their address ONE EMBARCARDERO CENTER all over the "Name" Section of the SEC filings.

275.     A review of the Morgenthaler SEC filings show the potentially tainted entity's profits surging in the last calendars, upon information and belief, as a result of the unlawful activities described herein.

276.     After learning of this proverbial smoking gun and it being obvious what Cognitive Code Conspirators have done, Plaintiffs Odish sent opposing counsel Howard Fredman an email asking him for an explanation. Attorney Fredman never responded to Plaintiffs. In a subsequent conversation with Fredman when Plaintiffs discusses "suing the Morgenthalers" Fredman states "well, you have sued them" in reference to the September 19, 2013 filing of the original complaint in this action and an obvious admission that Plaintiffs's rights and actions are being closely monitored and scrutinized by the Morgenthalers and their attorneys.

277.     Plaintiffs scoured the SEC, NUANCE, PEREGRINE, AND ONCOMED sites and all over the web to see if Nuance had made any "public disclosure" regarding an acquisition or collaboration agreement with Cognitive Code. Obviously none were stated. NUANCE'S RECENT SEC FILINGS vaguely and intentionally omit any mention of Cognitive Code, in furtherance and acknowledgment of their unlawful actions. There is simply only a vague but undefined reference to "Other Collaboration Agreement" in NUANCE'S SEC 10-K FILING from Sept. 30, 2013 and even the previous year Sept. 30, 2012.

278.     From Plaintiffs Odish's own unique personal knowledge, substantiated by his contractual rights (the stock rights with dual signature, affording him the right to review and sign every contract on behalf of Cognitive Code) and the documents within Plaintiffs Odish's possession, it is plainly clearly of that massive fraud that has taken place and will continue to take place until unless immediately enjoined and disgorged.

279.     A review of material portions of NUANCE's SEC 10-K FILING OF SEPT. 30, 2013 clearly displays that massive fraud and exploited because they [by Nuance's subtle admissions] have "embedded" new state of the art "artificial intelligence" or "digital assistant technology and Intellectual property into their products.

280.     Recently, Plaintiffs learned a number of disturbing facts. It became apparent from a review of SEC filings that the Morgenthalers were indeed closely scrutinizing Plaintiffs's actions and filings. For instance, The morgenthalers file a bogus 10b5-1 trading [on august 30, 2013] upon Plaintiffs' stated intention to sue the morgenthalers - an attempt to create an affirmative defense.

281.     The correspondences drafted by Plaintiffs's attorney Sean Walsh during the spring of 2012 specifically refenence the law firm of NIXON PEABODY, San Francisco, California office and Difazio's stated intention of traveling to San Francisco to meet with lawyers at Nixon Peabody on behalf of Cognitive Code Corporation. Nixon Peabody San Francisco specializes in "Life Sciences", technology, defense and other industries.

282.     Definition of Control as applicable to the individual Defendants controlling Nuance, Peregrine and the shell Morgenthaler entities used to perpetuate this fraud, such as Morgenthaler Partners LP and Morgenthaler Management LLC, etc. The SEC has defined "control" to mean: "The possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

283.     Defendants unlawful use and exploitation of legitimate government interests, such as the SEC affording companies to file CONFIDENTIAL TREATMENT ORDERS (or CTOs). As Plaintiffs Odish scoured the SEC site and all over the net looking for more information, it became clear that Gary Morgenthaler and the Defendants with their private or public entities, such as ONCOMED, PEREGRINE, and NUANCE, are benefitted by the wrongful use of CTOs. In reviewing the sec.gov site, and other Morgenthaler-backed entities, it became clear that they use CTOs for an improper purpose, which is to bury the Cognitive Code patent and seek protection by CTOs.

284.     Oncomed Pharmaceuticals, Inc. is a good example. And the James W. Broderick, M.D., similar to Robert Pavey and other Morgenthaler Ventures partners, and partners of Gary Morgenthaler in the venture capital company.

285.     James W. Broderick and Oncomed is an example of Defendants knowledge of their culpability and their violation of Federal statutes related to INVESTMENT COMPANY ACT and related statutes [and state statutes] related to INVESTMENT ADVISOR ACT.

286.     **Advisor emails and fraudulent scheme for yet another publicly traded company backed by Morgenthalers that went public in July of 2013.** The emails, some of which are restated herein, and other emails from Cognitive Code Defendants to Plaintiffs Odish constantly refer to Morgenthalers as "advisors" in handling the brokering the sale of Cognitive Code to HTC and Comcast, which of course they never did and instead wrongfully appropriated used this MATERIAL, NON PUBLIC information for insider trading and the unlawful misappropriation of a multi-billion dollar patent belonging to Cognitive Code and Plaintiffs Odish. Even Plaintiffs Odish in the December 6, 2011 email to Mimi Chen referred to Gary Morgenthaler and Morgenthalers as "advisors". As a result, it is easy for Plaintiffss through their significant diligence in the last 60 days of 2013 to determine what took place: the legion of lawyer at Morgenthalers

disposal reviewed the "smoking gun" emails that had been sent to Plaintiffs Odish and his response emails, realized that their clients the Morgenthalers and Morgenthaler Ventures in particular had liability under federal statutes related to "advisors" and Investment Company Act and needed someone in Morgenthaler Ventures to become a 'certified' Investment Advisor, again to artificially and fraudulently create a defense to the claims that Plaintiffs would bring.

287.      Thus, upon information and belief they instructed to James W. Broderick, M.D, and partner in Morgenthaler Ventures, to procure an accredited Investment Advisor certification in August 2012 through their Boston offices and then use this not only as a potential defense to the action they knew Plaintiffs would bring but also in furtherance of their fraudulent scheme to a) insulate Gary Morgenthaler and Morgenthaler Ventures from liability related to these specific federal statutes regardomgInvestment Company Act and Investment Advisors Act, and b) use JAMES W. BRODERICK as a "Reporting Person" in SEC filings (dated July 17, 2013) for ONCOMED PHARMACEUTICALS, INC., yet another publicly traded entity backed by Morgenthalers that went public in July of 2013.

288.      Upon strong information and belief, in review of the SEC filings by Morgenthalers related to ONCOMED, the wrongfully misappropriated and stolen patent and IP with its application in healthcare and medical field has also been used in ONCOMED PHARMACEUTICALS. The furtherance of their unlawful scheme, as in other entities, is clear by the continued use of CTOs [Confidential Treatment Orders] and "COLLOBARATION AGREEMENTS" filed, granted, accepted and "approved" by the SEC. See Index of Exhibits. And these CTOs do NOT expire until May 2018, beyond the limit of most applicable statute of limitations that would hold the Morgenthalers liable for civil damages but given the Morgenthalers have received fraudulent approval of these filings.

289.      Upon information and belief, ONCOMED PHARMACEUTICALS like the two other publicly traded entities effectively "controlled by Morgenthalers is a tainted entity.

290.      Defendants unlawful use and exploitation of legitimate government interests, such as the SEC affording companies to file CONFIDENTAIL TREATMENT ORDERS (or CTOs). As Plaintiffs Odish scoured the SEC site and all over the net looking for more information, it became clear that Gary Morgenthaler and the Defendants with their private or public entities, such NUANCE and PEREGRINE, are benefitted by the wrongful use of CTOs. In reviewing the sec.gov site, and other Morgenthaler-backed entities, it became clear that they use CTOs for an improper purpose, which is to bury the Cognitive Code patent and protect it by Confidential Treatment Orders, or CTOs.

291.      The vague Collobaration or Equity agreements that is not revealed in the NUANCE or PEREGRINE OR ONCOMED SEC FILINGS between Cognitive Code defendants and Defendants, especially the "Colloboration Agreement" vaguely referenced in NUANCE'S SEC FILINGS which of course does not specifically mention Cognitive Code at any point, is obviously illegal and violative of numerous federal laws.

292.      Upon Plaintiff's recent discovery of this information, obviously it is now clear that the Defendants, led by Gary Morgenthaler, wrongfully misappropriated

material non-public information for their own material gain. And this just did not relate to classic "insider trading" and trading of stock or manipulation of stock prices in NUANCE (NUAN), PEREGRINE SEMICONDUCTOR (PMSI), and given Morgenthaler Ventures significant stake and relationship with Apple (APPL), the egregious fraud and misconduct goes far beyond "insider trading" as the Morgenthalers Defendants in conspiracy with their close friends (the Partnership Co-Conspirators) have gutted Cognitive Code corporation and its valuable patent and intellectual property.

293.     A review of the current Artificial Intelligence patent held by Cognitive Code shows unusual and disturbing activity. Partnership Co-Conspirators, acting in furtherance of their conspiracy, have certainly assigned patent rights to other entities, likely overseas entities, and as further acts of the conspiracy almost certainly "buried" or "embedded" for unlawful gain and profits in multiple Morgenthaler-backed entities, upon strong information and belief.

294.     **MORGENTHALER SEC FILINGS WITH 'ONE EMBARCARDERO CENTER' LISTED "NAME" SECTION**.  In recognition of Defendants liability in this matter, the Morgenthalers and Nixon Peabody law firm filed a number of what now can rightfully be deemed fraudulent SEC filings/forms that simply had **"ONE EMBARCARDERO CENTER**" listed on the NAME section of SEC documents. One Embarcadero is the street address for the location of Nixon Peabody's San Francisco, California office.

295.     On December 8, 2013, Cognitive Code and Northrop Grumman announced a **new** licensing agreement, **likely the third** major licensing agreement Cognitive Code Co-Conspirators have signed with Northrop Grumman, unlawfully.

296.     **VTS (Virtual Training Systems) from Northrop Grumman.** The technology they have used SILVIA for has applications for them way beyond defense, including medical and healthcare, cellular, etc. Basically all the various and multiple uses of SILVIA Northrop Grumman can exploit.

297.     From Northrop Grumman's website it is clear that SAdie is nothing more than a perfected version of the SILVIA™ PLATFORM. [And NUANCE'S "NINA' is nothing more than a re-packaged and stolen version of SILVIA™]. The information regarding NG's SAdie is lifted directly from the NG's website and restated below:

298.     Cognitive Code SILVIA™ has since spring-summer of 2011 been worked on exclusively by Northrop Grumman's engineers and they are the world's best and most knowledge experts on this valuable cutting edge artificial intelligence software.

299.     Plaintiffs do not believe that these actions could have taken place without NG officials, engineers and executives not knowing anything. NG as stated herein just gave Cognitive Code a new license on December 8, 2013. Northrop Grumman also sponsored Cognitive Code Corporation a few months ago at its technology convention [the WBT Convention in October of 2013 in San Diego] as a new and shining tech star. As far back as 2011, Plaintiffs felt the company was nothing more than a 'de facto' subsidiary of Northrop Grumman.

300.     As stated herein previously, Northrop Grumman dedicated an ENTIRE BUSINESS UNIT to Cognitive Code's software known as SILVIA in late 2011, when NG executives, even the CEO, learned that Cognitive Code was a serious acquisition target (that two global tech behemoths such as HTC and COMCAST wanted not only to buy the company outright but wanted long-term significant licensing agreements)

301.     Cognitive Code essentially exists as a "de facto subsidiary" of Northrop Grumman and the fraud described herein with the morgenthalers could not take place without the knowledge of Northrop Grumman, its top executives and engineers.

302.     In 2011 Spring personally did not have the capability, engineering ability/muscle or know-how to complete SILVIA 2.0 (aka SILVIA FOR UNITY).

303.     On Northrop Grumman's website, it refers to Sadie™, the digital artificial assistant created by Northrop Grumman using Cognitive Code's intellectual property known as SILVIA™.

**"Sadie™ FROM NORTHROP GRUMMAN**
**Looking for an easier, more affordable and more intuitiveuser interface to access and manage your computerbased data? Whether the task is meeting training needs, performing maintenance tasks, issuing safety alerts or conducting mission support; Northrop Grumman's SAdIE has the answer. SAdIE provides a human computer interface that increases the quality and availability of the data being accessed while reducing costs and manning requirements, critical in today's tight budget environment. SAdIE is an articulate and adaptablevoice and visual interface to computer-based data. SAdIE verbally interacts with users in a natural conversational manner, answers questions concerning any topic and delivers overviews or seminars on specific subjects.Having a natural conversational interface to computerized data delivers important advantages. You can make queries verbally and without an in-depth understanding of the data, database structure or search tools. When you ask SAdIE a question, the interface rapidly locates the information in documents or SAdIE accessible databases.In addition, SAdIE will also query you to further understand a topic or question to offer related information pertinent to the conversation. Depending on your preference, SAdIE can be manifested as an intelligent voice, text interface or can be visually portrayed as a speaking, animated male or female avatar. SAdIE readily interfaces with and executes commands controlling other external hardware and software applications.SAdIE "learns" and grows smarter through conversations. As SAdIE performs required tasks, new data and data relationships are stored for future reference. A virtual assistant for multiple uses:**
**Northrop Grumman's SAdIE supports a wide range of uses requiring access to computerbased data. SAdIE is the perfect interface for training systems, and can be an intelligent digital substitute for a live trainer."**

**"REVERSE ENGINEERING"**

304.      Plaintiffs Odish states that Mimi Chen said to him in a phone conversation or possible email that her "advisor friends", the Morgenthalers, specifically Todd Morgenthaler, was an expert in "reverse engineering".

305.      Reverse Engineering of course is the unlawful theft and piracy of software and intellectual property patented in one country [UNITED STATES] that respect and honor patent right and deconstructed for unlawful theft, misappropriation and use in a foreign country that does not protect patent rights and potentially encourages such behavior. NUANCE has nearly 300 worldwide subsidiaries, a number of countries of which it could and likely did reverse engineer this technology to protect itself when this day came. Recognition of this likely fact makes the remedy of disgorgement and return of the patent and intellectual property a hollow penalty upon the Defendants and the parties mentioned herein.

306.       Given the strict language of federal procurement contracts that requires any and all subcontractors to be in compliance with all state and federal laws, the Cognitive Code Co-Conspirators and Defendants conspiracy, unlawful actions of misappropriation, embezzlement, fraud upon SEC with fraudulent REG D FORM filing, false SEC certification, and other violation and noncompliance with a number of federal laws mean that Cognitive Code Co-Conspirators and Defendants and related entities are likely to be disbarred from federal procurement contracts and US government funds.

307.      Cognitive Code's website has for the past year specifically touted it's licensing agreement from 2011 and now Cognitive Code, after burning through the 50 million dollars (upon strong information and belief) that they received from Northrop Grumman in 2011-2012, has now signed a new licensing agreement with Northrop Grumman. On it's website, Cognitive Code links to a new licensing agreement announced December 8, 2013. The link from the website to the announcement specifically states the following:

***"Cognitive Code Signs Licensing Agreement With Northrop Grumman - December 8, 2013***
***Northrop Grumman to Develop Products Utilizing Cognitive Code's SILVIA Technology (PRWEB) December 08, 2013***

***Cognitive Code Corp. announced today that Northrop Grumman (NGC) and Cognitive Code have signed a software licensing agreement that gives Northrop Grumman broad access to Cognitive Code's patented SILVIA® Platform and Technologies for Northrop Grumman's use in defense and other government markets. SILVIA is a cross-platform system for developing and deploying conversationally intelligent applications. Unlike other voice solutions, Cognitive Code's SILVIA can be deployed in compact and secure environments, and includes native unconnected operation on mobile devices and embedded systems. The SILVIA Platform's developer friendly tools and superior natural language capabilities allow for the rapid development and deployment of applications for almost any market, in almost any language.***

*"For the past several years, <u>Northrop Grumman</u> has been an important customer for Cognitive Code, and applications using our SILVIA technologies have already been developed and put into the field by NGC. Applications incorporating our SILVIA technologies include Northrop Grumman's 'SAdIE' line of products for government and defense markets," said Defendant Spring Spring, CEO and Founder of Cognitive Code. "This licensing agreement with Northrop Grumman is the next logical step in our relationship, and Plaintiffs at Cognitive Code look forward working with Northrop Grumman on the next generation of SILVIA-enabled intelligent applications."*

*Cognitive Code offers flexible licensing programs that give companies access to its patented SILVIA technologies, including SILVIA Studio <u>developer tools</u>, the cross-platform SILVIA Core runtime, and SILVIA Server for web-based deployment of conversational applications. Our technologies allow those companies to build applications and services that can work seamlessly with each other, across a number of devices and <u>operating systems</u>.*

*Cognitive Code provides software, services, and solutions centered on its SILVIA Platform, a system for developing and deploying commercial conversationally intelligent applications. More information about Cognitive Code and the SILVIA Platform is available at www.cognitivecode.com. SILVIA: Intelligence on Command".*

308.    The article specifically quotes Defendant Spring as stating that Cognitive Code has been in business with Northrop Grumman "for several years".. Cognitive Code Defendants through their attorney Howard Fredman inexplicably stated and continues to state there is **no agreement with Northrop Grumman**.

309.    The valuation of the company is based on the value of it generating revenues and comparable items. By Defendant Spring's own statement in January 2012 that the company was worth "several hundred million dollars", it most certainly has exceeded that valuation now two years later.

### CROSS-PLATFORMING SOFTWARE VERSUS APPLICATIONS OR "APPS"

310.    SILVIA™.  The software based on a very valuable patent that makes Cognitive Code worth at least one to two billion dollars. SILVIA™ is a CROSS-PLATFORMING SOFTWARE PIECE, and by that it is stated the SILVIA™ Has MULTIPLE PLATFORMS [as a platform it has the ability to create as many applications as possible] where its world class and revolutionary software can benefit any industry or business sector, such primarily the defense sector and healthcare, the two prime areas of false claims acts.

311.     SILVIA™ ALSO HAS PLATFORM ABILITY IN CELLULAR/MOBILE, IN AUTOMOTIVE TELAMETICS, TOYS, COMPUTING, ENTERPRISE, GAMING, etc. Any one of those industries could use or exploit SILVIA to make them a billion dollar in one industry alone.

312.     SAdie™. The intellectual property Northrop Grumman created and based from Cognitive code's SILVIA™.

313.     NINA™.  NINA is the "artificial intelligence" IP that the Morgenthalers unlawfully misappropriated in Conspiracy with Cognitive Code Defendants and are now marketing to US government and consumers everywhere. The global leader in voice, dictation and transcription is the Morgenthaler back entity NUANCE, a 5 billion dollar publicly traded entity.

314.     NINA™ is the new artificially intelligent digital assistant wrongfully and unlawfully being repackaged and sold for use to the global market and by NUANCE'S own SEC filings being marketed and sold to a number of United States government agencies.

315.     **National Security Interests**. Defendants have taken a patent and intellectual property used the Department of Defense and have buried it in China. False filings with United States Patent and Trademark Office show that a Spring Corporation, upon information and belief, is a "shell entity" that made a patent assignment to another "shell entity" in China.

316.     **THE APPLICABILITY OF 42 CFR 52.515-4**. This CFR *states that "all contractors for the United States Government shall be in compliance with all federal, state, local laws, rules and regulations.*

317.     Cognitive Code Defendants, as the Corporation was a subcontractor for Northrop Grumman, had to be in compliance with this and other CFRs and FARs, but it was not in compliance as prior to and continuing it had and continues to violate federal and state laws and regulations.

318.     The federal and state laws, regulations and rules include the following: tax fraud by Cognitive Code principals, embezzlement, securities fraud, fraud upon the United States government and its relevant agencies, including the SEC, USPTO and other agencies.

319.     A review of bank personal bank statements shows Cognitive Code Defendants also engaged in fraudulent Currency Transaction Reports with their financial institutions.

320.     **July 2013 and continuing henceforth - Commission of Perjury by Spring, Freidman, Rosen and others**. During the California federal proceedings, Friedman engaged in perjury and subornation of perjury by drafting three of four fraudulent affidavits

321.     **AN ILLICIT AGREEMENT BETWEEN DEFENDANTS TO DESTROY PLAINTIFF'S RIGHTS TO COVER THEIR FRAUD AND FRAUD UPON U.S. GOVERNMENT AGENCIES**. Upon strong information and belief, the Defendants have conspired together to destroy Plaintiffs rights in order to cover their fraud and conspiracy.

322.     Upon information and belief, Defendants have conspired to cover up the enormous fraud because

323.     Upon information and belief, Defendant Rosen, as Plaintiff Odish's

attorney, was induced by bribery and graft.

324.     In a legal malpractice action filed here in the Eastern District of Michigan by Odish against Rosen in September of 2013, Defendant Rosen, as part of the conspiracy, engaged in actions which were clearly fraudulent and an attempt to destroy Plaintiffs rights and prevent him from filing a Qui Tam action by attempting to effectuate a "public disclosure".

325.     Defendant Rosen on December 19, 2013 instructed his Michigan based attorney to file a Motion to Dismiss based upon ripeness but included a confidential brief drafted by Odish for the California proceedings.

326.     In the motion, Defendant Rosen included a confidential brief that had a one paragraph reference to his intention to file a Qui Tam. Defendant Rosen violated a court order by making this public. The brief was sent to Rosen and his associate attorney Jordan Rock because the judge ordered the filings to be made under seal but sent to Rosen and Odish. Odish redacted the paragraph in the brief in order to preserve confidentiality but inadvertently sent the version that did in fact mention the Qui Tam paragraph.

327.     Upon information and belief, Defendant Rosen took this action in order to protect Northrop Grumman and his fellow co-conspirators and in order to effectuate a "public disclosure" and harm Plaintiff Odish's lawful and ethical intentions. Defendant Rosen's intentions also was to harm the United States Government as the United States government was and remains a real party in interest.

**Theft and Unlawful Misappropriation of Intellectual Property.**

328.     Plaintiffs after executing contracts and agreements, including the March 6 Letter of Intent, the March 18 addendum and the contracts relating the Option to purchase additional equity.

329.     The option to purchase was triggered by a contractual agreement tied to the issuance of the pending patent. The patent was originally issued on February 28, 2012 with a patent number of #8126832, an artificial intelligence patent.

330.     Defendants, specifically Spring and his attorney Joel Bock, and other co-conspirators filed additional patents in order to "bury" and effectively "launder" the patent in order to cover up their fraud and conspiracy.

331.     Defendant Spring, as part of the conspiracy and fraud, would immediately after the issuance of patent #8126832, file additional fraudulent patents, including #8515892, #8521677 etc.

332.     Out of deference to the Court and in order to avoid confusion, Plaintiffs will simply state these false patents lead to patents unlawfully assigned to APPLE, NUANCE, NORTHROP GRUMMAN, and other tech giants including GOOGLE, SONY, IBM, AT&T, as well as suspicious individuals such as JEREMY LIEBERMAN, JOHN SAMUEL BUSHELL, etc.

333.     Apple took these unlawful assignments and made their own fraudulent assignments as part of this fraud and conspiracy.

334.     In August 2014, as Odish is learning about the patent fraud when he stumbles upon patent filings (false filings made by Apple) that show Apple had

and has direct and explicit knowledge of Odish's rights and have acted in concert to defraud Odish. The patent filings show Apple, with regards to Cognitive Code filings, knew about the lawsuit filed in California and immediately after it was filed, Apple took steps to cover up the fraud.

335.    In October 2014 after receiving an email from Apple's attorneys, Odish sent Apple's attorneys a copy of the patent filings seeking an explanation.

336.    They offered no such explanations.

## WILLFUL REFUSAL TO LAWFULLY COMPLY WITH SUBPOENAS.

337.    On September 19, 2014, Odish's attorneys finally sent out subpoenas out to a number of companies, including but not limited to APPLE, NORTHROP GRUMMAN, NUANCE, International Business Machines, HTC, and other entities.

338.    Apple replied with a complete and absolute objection to the Subpoena.

339.    Northrop Grumman did NOT respond at all. Northrop Grumman did not even file or submit blanket objections.

340.    Upon information and belief, Northrop Grumman did not respond or make any statements in response to the subpoena as, given their liability, they did not want to make any "false statements" to the judiciary that could be lawfully construed as negating the "judicial exception" of 18 USCS 1001.

341.    Nuance engaged a prominent Michigan attorney, David Dumouchel, who specializes in white collar crime.

342.    Defendant Nuance objected to subpoena but did not lawfully comply with the subpoena as it submitted meaningless emails and correspondences.

343.    Plaintiffs within last year have been printing off all of Defendant Nuance and Defendant Beaudoin's filings with the Securities and Exchange Commission. The filings show an onslaught of 10b5-1 trading plans filed with the SEC by Beaudoin, Bruce Bowden, and an executive named Tempesta.

344.    During the month of December, Defendant Rosen continued

345.    Subsequent to the filing of this action, attorney Howard Friedman representing Cognitive Code defendants, engaging in the use of mails sent Odish a document at his home in Michigan on the date of December 26, 2014.

346.    Upon information and belief, all of the corporate officers named in this complaint had explicit and direct knowledge of the rights of Plaintiffs and have engaged in fraud and conspiracy to destroy those rights.

## CAUSE OF ACTION 1 – RESPONDEAT SUPERIOR
### (against Corporate Defendants and their officers, agents, employees)

347.    Plaintiffs reincorporate all previous paragraphs as if fully set forth herein.

348.    The corporate defendants have a duty to control their employees

349.    Corporate defendants are liable for any activities conducted within the scope of their employments.

350.    Corporate Defendants had direct and explicit knowledge of the rights of Plaintiffs and chose to engage in fraud and deceit against those rights.

351.    Defendants actions are a proximate cause of Plaintiffs damages to be determined at trial.

## CAUSE OF ACTION 2
## VIOLATION OF CIVIL RICO STATUTE, 18 U.S.C.S. §§ 1961 et seq.
## VIOLATIONS AND CONSPIRACY TO VIOLATE

352.    Plaintiffs reincorporate and reallege all previous paragraphs as if fully set forth herein.

353.    Plaintiffs plead on the pattern of actions, motives and intent of Defendants actions and Plaintiffs rights.

354.    Defendants engaged in a pattern of racketeering activity, fraudulent filings with the Securities and Exchange, the United States Patent and Trademark Office, and false statements to judiciary with the intention to defraud the judiciary thereby implicating and negating the judicial exception as contemplated by certain federal statutes.

355.    The violations of the Civil Rico statute are numerous and Defendants knew all along that they do derive and will derive enormous financial gains by this conspiracy and fraud.

356.    **MAIL AND WIRE FRAUD**. There are numerous instances of mail and wire fraud committed and continue to be committed with regards to this fraud.

357.    Plaintiffs allege that the "predicate acts" of Defendants have been met as contemplated by the statute. This pattern of activity constitutes not only a pattern of racketeering activity but also constitutes an "enterprise" as contemplated by the statute.

358.    The fraud is wanton, malicious and conspiratorial in nature.

359.    Plaintiffs seek any and all damages, trebled in nature, actual, compensatory as well as any other relief appropriate, including punitive damages.

## CAUSE OF ACTION 3
## VIOLATION OF SECTION 10(b) of the Exchange Act
## [15 U.S.C. § 78(j)(b) and Rule 10b-5 thereunder 17 C.F.R. § 240.10b-5]
(Plaintiff Odish claim)

360.    Plaintiff Odish hereby reincorporates all previous paragraphs as if fully set forth herein.

361.    Plaintiff Odish has yet to receive his stock certificates and Plaintiff Cranbrook LLC is entitled to 7.5% stock option purchase (as well as 20% from original letter of intent damages).  Defendants in connection with the purchase and sale of securities described herein, by the use of the means and interstate commerce and by use of mails, directly and indirectly:

a) employed devices, schemes, and artifices to defraud;

b) made untrue statements or omitted to state material facts necessary in order to make the statements made, in light of the circumstances made, in light of the circumstances under which they were made, not misleading; and

c) engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

362.     Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, acts, schemes, and artifices to defraud, made untrue statements or omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, Defendants were aware of Plaintiff's rights and acted with scienter, that is, an intent to deceive, manipulate or defraud with a severe disregard for the truth. And further, Defendants knew Plaintiff was acting in reliance upon Defendants actions.

363.     By reason of the foregoing, Defendants, directly and indirectly, acting with Scienter, have violated and unless enjoined will continue to violate Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder [17 C.F.R. § 240.15].

364.     Loss Causation-Economic Loss. Defendants actions pursuant to the violation of this statutory section has been the proximate cause constituting loss causation and significant economic damages incurred by the Plaintiffs. Defendants presented a fraudulent picture that they would be handling sale of the company. Instead, Defendants took the opportunity for themselves and engaged in fraud upon Plaintiffs causing enormous damages.

### Cause of Action 4 - VIOLATION OF SECTION 10(b) of the Exchange Act [15 U.S.C. § 78(j)(b) and Rule 10b-5 thereunder 17 C.F.R. § 240.10b-5] [plaintiff cranbrook claim]

365.     Plaintiff "Cranbrook" hereby reincorporates all previous paragraphs as if fully set forth herein and incorporated by reference.

366.     Plaintiff and Defendants in connection with the purchase and sale of securities described herein, by the use of the means and interstate commerce and by use of mails, directly and indirectly:
a-employed devices, schemes, and artifices to defraud;
b-made untrue statements or omitted to state material facts necessary in order to make the statements made, in light of the circumstances made, in light of the circumstances under which they were made, not misleading; and
c-engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

367.     Defendant knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, acts, schemes, and artifices to defraud, made untrue statements or omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, Defendant were aware of Plaintiff's rights and acted with scienter, that is, an intent to deceive, manipulate or defraud with a severe disregard for the truth. And further, Defendant knew Plaintiff was acting in reliance upon Defendant actions.

368.     By reason of the foregoing, Defendant, directly and indirectly, acting with Scienter, have violated and unless enjoined will continue to violate Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder [17 C.F.R. § 240.15].

369.     Loss Causation-Economic Loss. Defendants actions pursuant to the violation of this statutory section has been the proximate cause constituting loss causation and significant economic damages incurred by the Plaintiff. Instead, Defendant was supposed to act in good faith and instead engaged in fraud upon Plaintiff causing enormous damages.

370.     Plaintiff cranbrook has a right to be made whole as a result.

## CAUSE OF ACTION 5 -- INSIDER TRADING
### Violations of Section 10(b) of the Exchange Act
### [15 U.S.C. § 78j(b)]and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

371.     Previous Paragraphs are hereby re-alleged and are incorporated herein by reference.

372.     Defendants, in connection with the purchase and sale of securities described herein, IN THE UNLAWFUL EXPLOITATION OF MATERIAL, NON-PUBLIC INFORMATION, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly: employed devices, schemes, and artifices to defraud; made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

373.     Defendant exploited MATERIAL, NON-PUBLIC INFORMATION and siezed the opportunity for themselves in an unlawful misappropriation of intellectual property.

374.     Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severely reckless disregard for the truth.

375.     By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

376.     At time that Cognitive Code was about to be sold to HTC AND COMCAST, DEFENDANTS, through their employees, executives, officers were in possession of material information regarding the tender offer, which Defendants knew or had reason to know was nonpublic, material, and knew or had reason to know was acquired directly or indirectly from an officer, director, partner, or employee or other person acting on behalf of the issuer.

377.     By reason of the foregoing, Defendants, directly and indirectly, acting with Scienter, have violated and unless enjoined will continue to violate Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder [17 C.F.R. § 240.15].

378.      Loss Causation-Economic Loss. Defendants actions pursuant to the violation of this statutory section has been the proximate cause constituting loss causation and significant economic damages incurred by the Plaintiffs. Defendants presented a fraudulent picture that they would be handling sale of the company. Instead, Defendants took the opportunity for themselves and engaged in fraud upon Plaintiffs causing enormous damages.

## COUNT 6
## VIOLATION OF § 20(a) of EXCHANGE ACT - CONTROL PERSON LIABILITY (AGAINST CORPIRATE DEFENDANTS NUANCE AND NORTHROP GRUMMAN)

379.      Plaintiffs restate and reallege all previous paragraphs as if restated fully herein.

380.      Title 15 U.S.C.A. § 77o provides as follows: § 77o. Liability of controlling persons: Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

        (a) Joint and several liability: Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

381.      The actions of co-conspirators constitute a primary violation of federal securities laws under 10b5.

382.      Control person provisions of Securities Act of 1933 and Securities Exchange Act of 1934, each of which provides that person who controls party that commits violation of securities laws may be held jointly and severally liable with the primary violator, are interpreted the same, even though they are worded differently. Securities Act of 1933, § 15, 15 U.S.C.A. § 77o; Securities Exchange Act of 1934, § 20(a), 15 U.S.C.A. § 78t(a).

383.      Defendants exercised control over the parties of Cognitive Code to his personal benefit and unlawful gain in violation of the federal statute.

384.      As a result of such control and violation of § 20(a) of Federal Securities laws, Plaintiffs were and are damaged an enormous sum of money to be proven at trial.

## CAUSE OF ACTION 7

## CIVIL CONSPIRACY

385.     Plaintiffs reincorporate by reference and re-allege the allegations of all previous paragraphs with the same effect as if fully set forth herein.

386.     Defendants and Conspirators owed Plaintiffs a duty. Defendants were well aware of that fiduciary duty, caused and intentional breach of that fiduciary duty and provided knowing and substantial assistance to Corporate Conspirators to the harm of Plaintiffs' rights.

387.     In such actions, the Defendants confederated and conspired with purpose, intent and effect of harming Plaintiff and tortiously interfering with Plaintiff's rights, activities, and prospective economic advantage. The Defendants took deliberate actions and continue to take deliberate actions in furtherance of their conspiracy.

388.     Each of the Defendants has now been acting as an agent for the other Defendants and each aided and abetted the actions of the other Defendants as well as the original Cognitive Code "Corporate Conspirators" named as Defendants in the pending actions, wherefore the Defendants are jointly and severally liable to the Plaintiffs.

389.     As a direct result and proximate result of such conspiracy, the Plaintiffs have suffered enormous damages and sustained significant economic losses.

## COUNT 8 - TORTIOUS INTERFERENCE WITH CONTRACTS, BUSINESS RELATIONSHIP AND PROSPECTIVE ECONOMIC ADVANTAGES

390.     Plaintiffs reincorporate by reference and re-allege the allegations of the previous paragraphs with the same effect as if fully set forth herein.

391.     The Plaintiffs have had and continue to have a binding lawful contracts entitling him to federal securities and stock certificates which Defendants and their Corporate conspirators wantonly and illegally refuse to provide the Plaintiffs.

392.     Plaintiffs further has contractual rights and had and continues to have prospective economic advantages, including but not limited to the sale of the company to HTC or COMCAST or third parties, which Defendants knew of and intentionally with said rights of Plaintiffs to their own benefit, thereby disrupting the lawful activities of Plaintiff and his prospective economic advantage.

393.     As a direct and proximate result of such interference, Plaintiffs have suffered enormous damages and sustained losses.

394.     In such actions, Defendants confederated and conspired to tortiously interfere  with Plaintiffs rights with the purpose, intent, and effect of harming Plaintiffs.

395.     The Defendants acted willfully, wantonly and with reckless disregard for the Plaintiffs' rights and interests.

396.     Each of the Defendants was an agent for the other Defendants and each aided and abetted the actions of the other Defendants, wherefore, the Defendants are jointly and severally liable to Plaintiffs.

## COUNT 9

## COMMOM LAW FRAUD
## (against all defendants)

397.     Plaintiffs repeat and reallege each and every allegations contained above as if set forth fully herein and further alleges as follows.

398.     All of the misrepresentations and omissions detailed above were made with the intent to mislead Plaintiffs and with the specific intent to have Plaintiffs rely on said misrepresentations and omissions. At a minimum, the representations were made recklessly, without knowledge of their truth or falsity. Plaintiffs did rely thereon and made investments in the Cognitive Code Corporation Securities to their detriment resulting in substantial losses.

399.     Further, the Defendants Controlling Shareholders' misrepresentations and omissions constitute constructive fraud, which entails the use of a confidential or fiduciary relationship to take advantage of another.

400.     Defendants' wrongful conduct constitutes fraud and deceit, and was committed and perpetrated willfully, wantonly, and/or purposefully on Plaintiffs.

401.     Defendants represented to Plaintiffs that Cognitive Code would grant them seats on its Board of Directors, make them members of the Executive Management Team and to require Plaintiffs approval and signature to any and all commercial agreements with third parties going forward.

402.     Defendants also represented to Plaintiffs at various times that commercial agreement negotiations were not taking place when in fact they were, that the terms and conditions of various commercial agreements that they eventually admitted to were of a certain quality or dollar amount when in fact they were materially different.

403.     Defendants made these representations to Plaintiffs with the intention of inducing them to support Cognitive Code, to provide professional services and business connections and otherwise work for its benefit.

404.     The representations were false or made with no present intention to honor them.

405.     The representations had their intended effect and caused and induced Plaintiffs to remain with and continue to provide services to Cognitive Code.

406.     Outrageously, the fraud being perpetrated upon Plaintiffs is now being also joined by Plantiff Odish's former attorney, Defendant Robert Rosen.

407.     As a consequence of the Defendant Controlling Shareholders' Fraudulent Conduct, Plaintiffs have been injured for which they are entitled to recover damages from the Defendant Controlling Shareholders in an amount to be determined at trial.

408.     As a direct and proximate result, Plaintiffs have sustained and continue to suffer economic damages and sustained significant economic damages.

## COUNT 10
## STATUTORY CONVER SION

409.     Plaintiffs repeat and reallege each and every allegations contained above as if set forth fully herein and further alleges as follows against named Defendants above.

410.     MCL 600.2919(a) states as follows:

(1)     A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:

(a)     Another person's stealing or embezzling property or converting property to the other person's own use...

(2)     The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.

411.     Defendants, either acted as the principal tortfeasors who actively aided in the conversion, the taking and carrying away, of tangible financial instruments such as securities and other corporate assets claiming these corporate assets as their own all of which constitutes a conversion contrary to Plaintiff's ownership and use without consent, justification or authorization.

412.     At no time did Plaintiffs consent or authorize one or more of the Defendants to unlawfully take and carry away, interfere with its strict ownership, control or dominion over the stocks or other corporate assets.

413.     The acts above constitute unlawful conversion of Plaintiffs' securities and other assets resulting in significant injury and damages to Plaintiff.

## COUNT 11
## CONCERT OF ACTION

414.     Plaintiffs repeat and reallege each and every allegation contained above as if set forth fully herein and further alleges as follows.

415.     At various and relevant times, several or all of the Defendants engaged in concerted activities described in previous paragraphs by express or implied agreements and concerted actions.

416.     The concerted activities engaged in by the Defendants as a result of their agreements were obvious, blatant, and done with willful and malicious intent.

417.     Plaintiff may not be able to identify all of the activities Defendants engaged in, but many of Defendants concerted activities were done with the malicious and specific intent to deprive Plaintiffs of certain rights and privileges that they owned, namely securities rights, Board Seat, management rights, refusal to disclose material information, concerted activity to intentionally fabricate information with the hope Plaintiffs would rely on such lies, and they did, as such concerted activities in the form of material misrepresentations were damaging to Plaintiffs.

418.     As a direct and proximate result of Defendants' concerted activities, Plaintiffs have sustained and will continue to sustain severe injury and damages as herein before described.

419.     Due to the concert of action among all of the various Defendants, each is liable to Plaintiffs for injury and damages.

420.     Defendants, jointly, severally and alternatively, are liable to Plaintiffs for all of their injuries and damages.

**COUNT 12**
**FRUSTRATION OF PURPOSE**
**(Plaintiffs Claim for 20% of company)**

421.      Plaintiffs incorporate the General Allegations  and all claims for relief herein by reference into this cause of action.

422.      Defendants entered into lawful agreements to provide financing to acquire 20% of Cognitive Code Corporation.

423.      Defendants engaged in frustration of purpose Preventing Plaintiffs from performing when they did have access to the funds.

424.      As a direct and proximate result of this wrongful activity to deny Plaintiffs rights, Plaintiffs have suffered substantial losses  and damages.

**COUNT 13 - COLLUSION**

425.      Plaintiffs incorporate the General Allegations  and all claims for relief herein by reference into this cause of action.

426.      Defendants are the primary  and proximate cause of any  and all damages incurred by the Plaintiffs, as a result of the conspiracy, constructive fraud, malicious prosecution, defamation  and various other illegal actions taken  and/or perpetuated by named Defendnats and other co-conspirators, Plaintiffs incurred monumental losses  and damages.

427.       Defendants entered into a deceitful agreement one with another in order to defraud and gain an unfair advantage over Plaintiffs, while pretending to be independent of each other. Defendant collusively used the combined clout  and market dominance to intimidate  and terrorize Plaintiff as well as others in order to fulfill there ulterior intents. Defendants continue to participate in a repeated pattern of illicit  and illegal activities with similar purposes, results, participants, victims, as well as methods that are not isolated events.

428.      Defendants engaged and are engaging in collusion against Plaintiffs.

429.      The defendants agreed or understood that the purpose of the actions were as described above, and understood that both the purpose  and the methods of achieving those purposes were unlawful  and would result in injury to Plaintiffs. Defendants conduct was attended by circumstances of fraud, malice, and willful and wanton conduct.

**Cause of Action 15 – Contribution and Indemnity**

430.      Plaintiffs incorporate the General Allegations, all previous paragraphs  and all claims for relief herein by reference into this cause of action.

431.      Defendant is the primary  and proximate cause of any  and all damages incurred by the Plaintiffs, as a result of the conspiracy  and fraud perpetuated by Defendants  and there co-conspirators.

432.     The Plaintiff is entitled to indemnification from Defendants, jointly and severally.

433.     The defendants understood that the purpose of their actions as described above,  and understood that both the purpose  and the methods of achieving those purposes were unlawful, reckless, deliberate and/or negligent  and would result in injury to Plaintiff. Defendants conduct was attended by circumstances of fraud, malice,  and willful  and wanton conduct as well as gross negligence.

## COUNT 16
## (Common Law Civil Conversion – Theft: Property, Securities)

434.     Plaintiffs incorporate the previous paragraphs  and all claims for relief herein by reference into this cause of action.

435.     Defendants have repeatedly refused to return the stolen properties (securities) to Plaintiffs  and to date have failed to turn over the property. As a result of Defendants willful  and wanton refusal and egregious misconduct, Plaintiffs have  and will continue to suffer significant and Exponential damages. Accordingly, Plaintiffs are entitled to damages for this wrongful conversion of his securities and property.

436.     The defendants agreed or understood that the purpose of their actions were as described above,  and understood that both the purpose  and the methods of achieving those purposes were unlawful  and would result in injury to Plaintiff  and others. Defendants conduct was attended by circumstances of fraud, malice, and willful  and wanton conduct.

## <u>COUNT 17</u>
## <u>Abuse of Process</u>

437.     Plaintiffs incorporate the previous paragraphs and all claims for relief herein by reference into this cause of action.

438.     Defendants, by and through current pending actions and prior actions, are engaging in fraud upon Plaintiffs and fraud upon the court system to defraud Odish because he is an attorney who will not be a party to unlawful misconduct.

439.     Defendants are the primary  and proximate cause of any  and all damages incurred by the Plaintiff, as a result of the ongoing abuses of process undertaken for ulterior purposes as well as to conceal various other illegal actions undertaken  and/or perpetuated by the Defendants and their co-conspirators, Plaintiffs have incurred monumental losses  and damages.

440.     Defendants entered into a deceitful agreement one with another in order to defraud and gain an unfair advantage over Plaintiffs, while pretending to be independent of each other. Defendants used the combined clout  and market dominance to intimidate  Plaintiffs as well as others in order to fulfill there ulterior intents. Defendants continue to participate in a repeated pattern of illicit  and illegal activities with similar purposes, results, participants, victims, as well as methods that are not isolated events.

441.	The defendants agreed or understood that the purpose of there actions were as described above,  and understood that both the purpose  and the methods of achieving those purposes were unlawful  and would result in injury to Plaintiff  and others. Defendants conduct was attended by circumstances of fraud, malice, and willful  and wanton conduct.

## CAUSE OF ACTION 18
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

442.	Plaintiffs reincorporate all previous paragraphs as if fully restated herein.
443.	Defendants were aware that their Partnership Co-Conspirators had a fiduciary duty to Plaintiffs.
444.	In utter disregard of said fiduciary duty and in knowing participation and substantial assistance, Defendants aided and abetted the knowing breach of the fiduciary duty Cognitive Code Co-Conspirators owed to Plaintiffs.
445.	Defendants actions were and are a proximate of Plaintiffs harm and damages.
446.	Plaintiffs have suffered significant damages as a result of Defendants actions in an amount to be proven at trial.

## *PRAYER FOR RELIEF*

**WHEREFORE,** Plaintiffs request that the Court enter relief and judgment in their favor and against Defendants as follows:
a) Awarding actual, compensatory and special damages, including any and all other damages where applicable, in favor of the Plaintiffs against Defendants, jointly and severally and on behalf of any co-conspirators, for all damages sustained as a result of the Defendants' wrongdoing in an amount to be proven at trial, including interest thereon;
b) Awarding Plaintiffs reasonable costs and expenses incurred in this action, including counsel fees, expert fees, and prejudgment and post-judgment interest;
c) Allowing Plaintiffs preliminary and permanent injunctive relief; and
d) Such other relief as the Court may deem just and proper.

***DEMAND FOR JURY TRIAL***
Pursuant to FRCP 38, Plaintiffs hereby demand a trial by jury on all issues so triable.

/s/ JOSEPH ODISH
JOSEPH G. ODISH P53629

Attorney for Plaintiffs
ODISH & ASSOCIATES, PLLC
39341 FULTON CT, STE. 100
FARMINGTON HILLS, MI 48331
310-345-2802

josephodish@gmail.com

DATED: MAY 31, 2015